[No. B112469. Second Dist., Div. Three. Aug. 28, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
WESLEY EUGENE SCOTT, Defendant and Appellant.

## COUNSEL

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Brad D. Levenson and Jennevee H. DeGuzman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant, Wesley Eugene Scott, appeals from the judgment entered following his conviction, by jury trial, for assault with a firearm and felon in possession of a firearm, with firearm use, great bodily injury, prior prison term and prior serious felony enhancements (Pen.

Code, §§ 245, 12021, 12022.5, 12022.7, 667.5, 667, subd. (a)(1)).[1] Sentenced to a state prison term of 25 years, 4 months, he contends there was trial and sentencing error.

The judgment is affirmed.

### BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

1. *Prosecution evidence.*

Latanya Jackson lived at 1126 East 48th Street in Los Angeles County. She resided there with defendant Scott, Kaye Sawyer, and the owner of the house—93-year-old Eva Paulin. Jackson worked as Paulin's caregiver. Jackson's live-in boyfriend, Moses Botez, slept on a couch on the front porch. When Scott came home on July 6, 1996, he asked Sawyer and Paulin for money, and they told him they didn't have any. Scott then approached Jackson and said, "Bitch, do you have any money?" When Jackson said she didn't, Scott said "Fuck you, bitch. You are lying." Scott knew Botez received his general relief check on the third day of each month and gave Jackson a portion of it.

Scott choked Jackson and again asked if she had any money. When Jackson again said she didn't, Scott replied, "Fuck you. [¶] I do not pimp, [*sic*] penitentiary niggers." While Scott was choking Jackson, Botez looked through the window and saw what was going on. Botez said, "Get your hands off my wife and come out of there." After Botez repeated this order, Scott took his hands off Jackson's throat and moved towards the front screen door. Botez told him to open it. Scott said, "Fuck you, Moses. I'm going to shoot your ass." Scott opened the screen door, took a revolver from his right front pocket, and shot Botez in the neck.

When Scott was arrested four days later, police found a loaded .32-caliber revolver in his pocket. The gun contained two live rounds.

2. *Defense evidence.*

Scott testified that he lived with Paulin and Sawyer. Jackson didn't reside there; she just stayed at the house because she and Scott were lovers. Botez stayed outside of the house because he was aware of the relationship.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On the evening of July 6, 1996, Scott had a run-in with a group of men while he was walking home. He recovered a gun from one of the men and put it into his back pocket. When he got home, he and Jackson argued, and she attacked him. Botez witnessed the argument. When Scott stepped out onto the porch, Botez came at him "very fast" with a butcher knife. Scott testified he told Botez to drop the knife: "I said, 'Moses, put the knife down, man.' I said it three times. I said, 'Please put the knife down. I do not want to kill you.'" Scott testified he was "back pedaling and reaching for the gun at the same time until I couldn't back up no more." Botez was coming straight at him, the knife in his upraised hand. Without aiming at Botez, Scott fired the gun. He didn't intend to kill Botez; he just wanted to scare him. "I am figuring just by shooting it, you know, this is going to stop him. I am trying to keep this man from sticking me with this knife."

In 1990, Delva Gamboa, Botez's niece, filed a police report after Botez hit her with a stick. When police arrested Botez, he was in possession of a knife. Gamboa told a defense investigator that Botez beat her and tried to stab her, and that Botez became violent when he was drunk.

### 3. Rebuttal evidence.

Malcolm Alex, former security guard at Webb's Liquor Store, was acquainted with Botez and Jackson, whom he knew to be big drinkers. He thought Botez was a harmless drunk.

### CONTENTIONS

1. The trial court erred by denying Scott's *Faretta* motion.

2. The trial court improperly imposed sentences for both the aggravated assault conviction and a firearm use enhancement.

### DISCUSSION

### 1. Faretta motion.

■ Scott contends the trial court erred by denying his motion for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562]. This claim is meritless.

■ "A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal

prosecution. [Citations.] At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself. (*Faretta v. California, supra,* 422 U.S. 806, 819 [95 S.Ct. 2525, 2533] . . . ." (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262].) "[U]nlike the right to be represented by counsel, the right of self-representation is not self-executing. In *Faretta,* . . . the court held that a knowing, voluntary, and unequivocal assertion of the right of self-representation, made weeks before trial by a competent, literate defendant, should have been recognized [citation]; subsequent decisions of lower courts have required expressly that the defendant make a timely and unequivocal assertion of the right of self-representation. [Citations.]" (*Id.* at pp. 20-21.)

"Many courts have explained that a rule requiring the defendant's request for self-representation to be unequivocal is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation. Without a requirement that a request for self-representation be unequivocal, such a request could, whether granted or denied, provide a ground for reversal on appeal. . . . [¶] We share the concern that some assertions of the right of self-representation may be a vehicle for manipulation and abuse. . . . The high court has instructed that *courts must draw every inference against supposing that the defendant wishes to waive the right to counsel.* [Citation.] It follows, as several courts have concluded, that in order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself. [Citations.] The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. *Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied.*" (*People v. Marshall, supra,* 15 Cal.4th at pp. 22-23, italics added.)

In order to invoke an unconditional right of self-representation, a defendant must unequivocally assert the right within a reasonable time prior to the commencement of trial. (*People v. Frierson* (1991) 53 Cal.3d 730, 742 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People v. Burton* (1989) 48 Cal.3d 843, 852

[258 Cal.Rptr. 184, 771 P.2d 1270].) A request made after this time period is left to the discretion of the trial court. In exercising that discretion, a trial court is required to consider (1) the quality of counsel's representation, (2) the defendant's prior proclivity to substitute counsel, (3) the reasons for the request, (4) the length and stage of the proceedings, and (5) the disruption or delay which might reasonably be expected to follow the granting of such a motion. (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187] (*Windham*).)

On Thursday, January 28, 1997, four days before trial was set to begin, Scott made a *Marsden*[2] motion for substitution of appointed counsel. When this motion was denied, Scott immediately moved to represent himself. The trial court denied this motion after Scott said he would not be ready for trial without a continuance. The following colloquy occurred:

"[TRIAL COURT]: Mr. Scott, I'll not grant your right at this late date to represent yourself, unless you tell me that you are going to be ready to try this case beginning no later than February 3, 1997, which is 10 of 10.

"[SCOTT]: Look, your Honor, let's don't be silly here. We are men sitting here. I got six days to try a case [*sic*]. I told you four months ago I did not want this man for my attorney. You overruled it and refused my request and made me have this attorney anyway. I tried to make it work. It did not work. Now, we [are] six days from trial. I can't stop you from going on and having the trial. You know, I'll have something to say about that later. You know what is coming.

"[THE COURT]: I don't know anything that is coming.

"[SCOTT]: This is what we have appellate courts for, higher jurisdictions to settle these kind of questions. You know and I know and everybody in here know that at six days time if I got to put on a full fledged trial with the witnesses and everything, that is not enough time. We all know this. But that's not going to coerce me into, you know, exercising [*sic*] my constitutional right to represent myself. Because I don't want [appointed defense counsel] to represent me.

"[TRIAL COURT]: Do you understand that I will not be granting a continuance for the.purpose of trying this case.

"[SCOTT]: You know, you did not say that.

"[TRIAL COURT]: Let me make it clear. I will not be granting a continuance. I will not entertain any motion to continue at this late date."

---

[2]*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

The prosecutor made a brief statement, after which the exchange between Scott and the trial court continued:

"[TRIAL COURT]: I want to make it clear what you are doing here, Mr. Scott. For the appellate record at this point we are six of 10. I am not going to be—

"[SCOTT]: That's not my fault.

"[TRIAL COURT]: It does not matter whose fault it is. We are six of 10. You want to consider your fault, look at this directly, the position you are in. We are six of 10. I am telling you that I am not going to entertain any motion to continue the case. And that if you want to represent yourself you have to represent to me unequivocally that you can try this case.

"[SCOTT]: Can't say that. I would be lying to the court.

"[TRIAL COURT]: The motion to represent yourself is denied."

 We conclude the trial court did not err by denying Scott's untimely and equivocal *Faretta* request. Motions made just prior to the start of trial are not timely. (See *People v. Hill* (1983) 148 Cal.App.3d 744, 757 [196 Cal.Rptr. 382] [*Faretta* motion made five days before trial was untimely and within trial court's discretion to deny]; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 791 [191 Cal.Rptr. 249] [*Faretta* motion made six days before trial was untimely].) More importantly, the motion was not unequivocal. Scott made his *Faretta* motion *immediately after* the trial court denied his *Marsden* motion,[3] and Scott's subsequent comments suggest he made the *Faretta* motion only because he wanted to rid himself of appointed counsel. When the trial court gave Scott a waiver of rights form in response to his *Faretta* request, the court said: "For the record, let me repeat it. Mr. Scott, are you sure you want to represent yourself?" Scott replied, "Yes. I do, judge. I don't want [appointed defense counsel] to represent me." Scott also said: "[I]f I can't get a [new] state appointed attorney, then I represent myself," and, "For the record, I don't want this attorney representing me. You the court is coercing me."

Scott argues his *Faretta* motion was timely because it was made "at the first opportunity after being informed that he would be represented by a lawyer whom he did not trust." The record does not support this contention.

---

[3]Scott's *Faretta* motion was first made at the in camera *Marsden* hearing: "The Court: Mr. Scott, for the record, my ruling is: I am not going to appoint a new lawyer to represent you. [¶] The Defendant: If that's the case, I hereby move the court to let me go pro se."

Scott's first *Marsden* motion was heard and denied on September 23, 1996. His renewed *Marsden* motion was not made until January 28, 1997. Thus, Scott appears to have had plenty of opportunity within that four-month period to make a timely *Faretta* motion.

Scott argues that even if his *Faretta* motion was untimely, the trial court abused its discretion by denying it without considering the *Windham* factors. Not so. In the first place, even had the motion been timely, it was still equivocal—and that was sufficient reason for denying it. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1109-1110 [74 Cal.Rptr.2d 121, 954 P.2d 384].) In the second place, while the trial court may not have explicitly considered each of the *Windham* factors, there were sufficient reasons on the record to constitute an implicit consideration of these factors. (See *People v. Marshall* (1996) 13 Cal.4th 799, 828 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Perez* (1992) 4 Cal.App.4th 893, 904 [6 Cal.Rptr.2d 141].) The record reflects that: Scott had a proclivity for trying to substitute counsel (he had made at least two *Marsden* motions); as a result of the *Marsden* motions, the trial court was aware of the quality of defense counsel's representation; Scott's main problem with counsel was a disagreement over trial tactics, which is "an insufficient reason to grant an untimely *Faretta* request"[4] (*People v. Wilkins* (1990) 225 Cal.App.3d 299, 309, fn. 4 [275 Cal.Rptr. 74]); Scott asked for a continuance, which would definitely have delayed the upcoming trial; and, it appeared Scott made the *Faretta* motion out of frustration at having his *Marsden* motion denied, rather than from a genuine desire to represent himself.

### 2. *Firearm-use enhancement.*

Scott contends the 10-year firearm-use enhancement under section 12022.5, subdivision (a)(1) was improper because the jury had been improperly reconvened to make the enhancement finding; the trial court failed to instruct the jury on the elements of the enhancement; and imposition of the enhancement term constituted a double jeopardy violation. These claims are meritless.

### a. *Reconvened jury.*

Scott contends the trial court was without authority to reconvene the jury to determine the truth of the firearm-use allegation because the jury had already returned verdicts on the substantive counts and made a finding on another enhancement allegation. This claim is meritless.

---

[4]The transcript of the *Marsden* hearing demonstrates that Scott's complaints were essentially related to disagreements over trial tactics. Scott's main complaint was that counsel had not filed motions Scott wanted, but which counsel had deemed inappropriate.

After the jury returned verdicts of not guilty of attempted murder, guilty of assault with a firearm (with a great bodily injury enhancement), and guilty of being a felon in possession of a firearm, and after the jury was polled as to these findings, the trial court immediately ordered the jurors back to the juryroom. There followed a brief discussion with counsel regarding how to proceed on the remaining prior conviction and prior prison term allegations. It was then that the trial court apparently realized the verdict forms had not asked the jury to make a finding on the section 12022.5 firearm use allegation. The trial judge proposed having the clerk enter the verdicts already reached, and then submitting the omitted enhancement allegation to the jury. Over Scott's objection, the trial court informed the jury an enhancement allegation had been inadvertently overlooked, and that they would be provided with an additional verdict form for that purpose. The new verdict form stated: "As to Count 2 of the Information, we further find the allegation that in the commission and attempted commission of the above offense, the said defendant, WESLEY EUGENE SCOTT, personally used a firearm, to wit: HANDGUN, within the meaning of Penal Code Sections 12022.5(a) to be _____." The jury found the allegation true.

 Scott acknowledges the following general rule: " 'Once a "complete" verdict has been rendered per [Penal Code] section 1164[5] [i.e., a verdict that has been received and read by the clerk, acknowledged by the jury, and recorded] and the jurors discharged, the trial court has no jurisdiction to reconvene the jury regardless of whether or not the jury is still under the court's control [citation]. However, if a complete verdict has not been rendered [citations] or if the verdict is otherwise irregular [citations], jurisdiction to reconvene the jury depends on whether the jury has left the court's control. If it has, there is no jurisdiction [citations]; if it hasn't, the jury may be reconvened [citations].' [Citation.]" (*People v. Hendricks* (1987) 43 Cal.3d 584, 597 [238 Cal.Rptr. 66, 737 P.2d 1350].) "The rule rests on two bases. First, in cases in which the jury renders a complete verdict, the rule is designed to protect the verdict as an operative fact. . . . [¶] Second, in all cases—and therefore fundamentally—the rule is designed to guarantee a fair trial, controlled by the court and shielded from outside influences." (*Ibid.*)

---

[5]Section 1164 provides as follows: "(a) When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case. [¶] (b) No jury shall be discharged until the court has verified on the record that the jury has either reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limited to, the degree of the crime or crimes charged, and the truth of any alleged prior conviction whether in the same proceeding or in a bifurcated proceeding."

 Nevertheless, Scott argues the verdict was complete within the meaning of section 1164 because it was recorded, read to the jury, and no disagreement was expressed. But this accounts for only half of the *Hendricks* rule, which says that a trial court lacks jurisdiction to reconvene a jury once a complete verdict has been rendered *and* the jury has been discharged. The jurors here had clearly not been discharged because immediately after rendering their verdict they were sent back to the jury room by the trial court, which told them: "I need to discuss something and we will bring you right out in a few minutes and have some more things to discuss with you. Please go back [to the jury room]. At this point don't discuss the case at all."

Scott's reliance on *People v. McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896 [98 Cal.Rptr.2d 431, 4 P.3d 265], is misplaced because there—as a result of a concession by the People on appeal—"the propriety of the attempt to complete the verdict was not placed in issue." (*People v. Bonillas* (1989) 48 Cal.3d 757, 775 [257 Cal.Rptr. 895, 771 P.2d 844].)[6] The holding in *Bonillas*—where the jury was reassembled four days after first rendering a verdict—is applicable to the case at bar: "Where, as here, further proceedings are to take place, the jury has not been discharged, the jurors have been specifically instructed that they are still jurors in the case, they have been admonished not to discuss the case with anyone nor permit anyone to discuss the case with them, and they have been directed not to read anything about the case, the jurors have not thrown off their character as jurors nor entered the outside world freed of the admonitions and obligations shielding their thought processes from outside influences. Clearly, the jury here remained within the court's control [citations], their verdict was incomplete, and the court was authorized to reconvene the jury to complete its verdict." (*Bonillas*, at p. 773.)

Scott's attempt to distinguish *Bonillas*, because there the jury failed to make a finding it had been asked to make, is unavailing. "Whether the verdict in the present case was 'incomplete' in light of the instructions given, or whether it should have been immediately recorded, are distinctions without relevance. *Bonillas* stands for the proposition *any* error in the verdict may be corrected by reconvening the jury, as long as the jurors have not lost their character as jurors by, for example, discharge or receiving information inadmissible in the relevant phase of the proceeding." (*People v. Cain* (1995) 10 Cal.4th 1, 54-55 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

---

[6]Scott's reliance on *People v. Bento* (1998) 65 Cal.App.4th 179 [76 Cal.Rptr.2d 412] is also misplaced. *Bento* involved an entirely different question: "[W]hether the 'last moment' for a juror to express dissent expires when the verdict is complete, rather than when the trial court discharged the jury or otherwise loses its ability to shield the jury from outside influences." (*Id.* at pp. 189-190.)

Here, the failure to include the firearm-use allegation in the initial set of verdict forms was an error that rendered the resulting verdict incomplete. This error could be corrected so long as the trial court had not lost control over the jurors. As Scott concedes, "[t]here is no question that . . . the jury was still under the court's control when it was recalled for the purpose of making a finding on the gun use enhancement." In this situation, the trial court properly reconvened the jury to make the additional finding.

 b. *CALJIC No. 17.19.*

 Scott contends that even if the jury had been properly reconvened, the trial court erred by allowing it to make the finding without having provided any jury instructions defining the elements of the enhancement. He argues that under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], this failure to instruct constituted reversible per se error. We agree there was error, but conclude it was harmless.[7]

 *Apprendi*'s basic holding was: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. . . . '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' " (*Apprendi v. New Jersey, supra,* 530 U.S. at p. 490 [120 S.Ct. at pp. 2362-2363].) Scott argues that because the trial court violated this rule by failing to instruct on the elements of the firearm-use enhancement, *Apprendi* mandates that imposition of the enhancement is reversible per se. This argument rests on Scott's premise that "under *Apprendi*, enhancements . . . are the functional equivalents of substantive offenses." But this premise is wrong.

 *Apprendi* was quite clear in likening an enhancement to an element of the underlying offense, rather than to a separate criminal offense. "This is not to suggest that the term 'sentencing factor' is devoid of meaning. The term appropriately describes a circumstance, which may be either aggravating or

---

[7]Although the Supreme Court is apparently to decide whether the proper harmless error test is *Chapman* (*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]) or *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243), the result here will not be affected: "The issue of what harmless error standard applies to failure to instruct on an element of an enhancement is currently pending in the Supreme Court. (*People v. Marshall* (2000) 83 Cal.App.4th 186 [99 Cal.Rptr.2d 441], review granted Nov. 29, 2000, S091666 [briefing deferred pending decision in *People v. Sengpadychith,* S090076].) We need not address the issue here because, as we explain, even under the higher *Chapman* standard the instructional error is harmless." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 588-589 [102 Cal.Rptr.2d 254].)

mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent of an element of a greater offense* than the one covered by the jury's guilty verdict. Indeed, *it fits squarely within the usual definition of an 'element' of the offense.*" (*Apprendi v. New Jersey, supra*, 530 U.S. at p. 494, fn. 19 [120 S.Ct. at p. 2365], italics added; see also *In re Tameka C.* (2000) 22 Cal.4th 190, 198-199 [91 Cal.Rptr.2d 730, 990 P.2d 603] ["enhancements do not constitute separate crimes or offenses, but simply are the basis for the imposition of additional punishment for the underlying substantive offense"].)

Properly analyzed as the functional equivalent of an offense element, the effect of the missing section 12022.5 instruction could be—given the facts of the particular case—harmless error. ■ "We have recognized that 'most constitutional errors can be harmless.' [Citation.] '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' [Citation.] Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' *Johnson* v. *United States*, 520 U. S. 461, 468 [117 S.Ct. 1544, 137 L.Ed.2d 718, 157 A.L.R.Fed. 789] (1997) (citing *Gideon* v. *Wainwright*, 372 U. S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733] (1963) (complete denial of counsel); *Tumey* v. *Ohio*, 273 U. S. 510 [47 S.Ct. 437, 71 L.Ed. 749] (1927) (biased trial judge); *Vasquez* v. *Hillery*, 474 U. S. 254 [106 S.Ct. 617, 88 L.Ed.2d 598] (1986) (racial discrimination in selection of grand jury); *McKaskle* v. *Wiggins*, 465 U. S. 168 [104 S.Ct. 944, 79 L.Ed.2d 122] (1984) (denial of self-representation at trial); *Waller* v. *Georgia*, 467 U. S. 39 [104 S.Ct. 2210, 81 L.Ed.2d 31] (1984) (denial of public trial); *Sullivan* v. *Louisiana*, 508 U. S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182] (1993) (defective reasonable-doubt instruction)[)]." (*Neder v. United States* (1999) 527 U.S. 1, 8 [119 S.Ct. 1827, 1833, 144 L.Ed.2d 35].) "[A]n instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (*Id.* at p. 9 [119 S.Ct. at p. 1833].) *Neder* went on to note that "this Court has applied harmless-error review in cases where the jury did not render a 'complete verdict' on every element of the offense." (*Id.* at p. 9 [119 S.Ct. at p. 1835].)

Discussing one of the cases mentioned in *Neder*, our Supreme Court said: "In our view, [the] analysis [in *California v. Roy* (1987) 519 U.S. 2 [117 S.Ct. 337, 136 L.Ed.2d 266]] indicates that instructional errors—whether

misdescriptions, omissions, or presumptions—as a general matter fall within the broad category of trial errors subject to *Chapman*[8] review on direct appeal." (*People v. Flood* (1998) 18 Cal.4th 470, 499 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

In the case at bar, we know the trial court's failure to instruct on the elements of the firearm use enhancement was harmless beyond a reasonable doubt. CALJIC No. 17.19,[9] the standard firearm use instruction that Scott complains was not given, contains only three substantive elements: (1) a definition of the word "firearm"; (2) an explanation that the term "personal use" includes intentionally firing a gun; and (3) an admonition that the prosecution has the burden of proving this allegation beyond a reasonable doubt. It was undisputed at trial that Scott intentionally fired the gun; he relied on a claim of self-defense. In such circumstances, his assault with a firearm conviction *necessarily* included a finding of firearm use as defined by section 12022.5. (See *In re Tameka C., supra,* 22 Cal.4th at p. 197 [because defendant committed assault with a firearm she also necessarily used a firearm in committing the offense, thus warranting a § 12022.5 enhancement, even if she had no intent to injure victim]; see also *Clark v. State* (2001) 2001 N.D. 9 [621 N.W.2d 576, 581] [*Apprendi* error—enhancing manslaughter sentence based on trial court's firearm use finding—was harmless under *Chapman*: "The only predicate fact necessary for the court's imposition of an enhanced sentence was that Clark used a firearm in committing the crime. Clark concedes the use of a firearm in committing the crime. His only defense at trial was that he was acting in self-defense"]; *State v. Price* (2001) 61 Conn.App. 417 [767 A.2d 107, 113] [*Apprendi* error —failing to instruct jury on elements of firearm use enhancement—was harmless under *Neder* because "the omitted element was uncontested and supported by overwhelming evidence"].) As for the absence of a specific instruction that the beyond-a-reasonable-doubt standard applied to the enhancement allegation, "the omission . . . was nonprejudicial since the court

---

[8]*Chapman v. California, supra,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].

[9]CALJIC No. 17.19 provides: "It is alleged [in Count[s] _____] that the defendant[s] _____ personally used a firearm during the commission of the crime[s] charged. [¶] If you find the defendant[s] _____ guilty of [one or more] of the crime[s] charged [or an attempt to commit the crime[s] charged] [or a lesser and included felony offense], you must determine whether the defendant[s] _____ personally used a firearm in the commission of [that] [those] [felony] [felonies]. [¶] The word 'firearm' includes [a _____.] [any device designed to be used as a weapon from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion.] [The 'firearm' need not be operable.] [¶] The term 'personally used a firearm,' as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true. [¶] Include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

otherwise instructed on reasonable doubt." (*People v. Louis* (1977) 75 Cal.App.3d 620, 625 [142 Cal.Rptr. 182].)

### c. *Double jeopardy.*

■ Finally, Scott contends that—even if the jury properly determined that the firearm use allegation was true—imposition of the enhancement on top of the sentence for the underlying assault with a firearm conviction amounted to a double jeopardy violation. This claim is meritless.

Section 12022.5, subdivision (d) mandates imposition of a sentencing enhancement if a defendant personally uses a firearm in the course of committing assault with a firearm. (*People v. Ledesma* (1997) 16 Cal.4th 90, 92-93 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) Scott argues that after *Apprendi* this can no longer be allowed. But *Apprendi* was not a double jeopardy case; it was a right to jury trial case. As discussed above, Scott's argument is based on his mistaken assertion that *Apprendi* likened an enhancement to an independent substantive offense. Because *Apprendi* actually likened an enhancement to an element of the underlying offense (whose maximum sentence it increases), Scott's double jeopardy claim fails. The plain language of section 12022.5 makes it part of the underlying substantive offense. "In the case of the firearm-use enhancement, . . . it is clear that the Legislature intended to impose additional punishment even though the firearm use is an *element* of the underlying offense of assault as defined by section 245." (*In re Tameka C., supra,* 22 Cal.4th at p. 199, fn. 5.)

### DISPOSITION

The judgment is affirmed.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 28, 2001. Chin. J., did not participate therein.