Filed 11/19/13  P. v. Acosta CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>STEVE P. ACOSTA,<br><br>　　　　Defendant and Appellant. | A133462<br><br>(San Francisco City & County<br>Super. Ct. No. 206899) |

　　　　A jury convicted defendant Steve P. Acosta of multiple offenses against his former spouse, including attempted murder, torture, criminal threats, and infliction of great bodily injury involving domestic violence, and felony vandalism.  Defendant contends his convictions must be reversed in whole or in part because (1) the trial court improperly denied his motion to represent himself during trial, and (2) there was insufficient evidence he committed vandalism.  Finding no merit in defendant's arguments, we affirm the judgment.

## I.  BACKGROUND

### A.  *Charges*

　　　　Defendant was charged in a third amended information with one count of torture (Pen. Code,[1] § 206) with the use of a deadly weapon (§ 12022, subd. (b)(1)) and the infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)), two counts of stalking (§ 646.9, subds. (a), (b)) with the use of a deadly weapon (§ 12022, subd. (b)(1)) and the infliction of great bodily injury involving domestic violence

---

[1] All further statutory references are to the Penal Code.

(§ 12022.7, subd. (e)), four counts of criminal threats (§ 422), four counts of disobeying a domestic relations order (§ 273.6, subd. (a)), two counts of vandalism (§ 594, subds. (b)(1) & (b)(2)(A)), one count of premeditated attempted murder (§§ 187, subd. (a), 664) with the use of a deadly weapon (§ 12022, subd. (b)(1)) and the infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)), one count of aggravated mayhem (§ 205) with use of a deadly weapon (§ 12022, subd. (b)(1)), one count of assault with a deadly weapon (§ 245, subd. (a)(1)) and the infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)), one count of residential burglary (§ 459) with use of a deadly weapon (§ 12022, subd. (b)(1)), one count of domestic violence (§ 273.5, subd. (a)) with the use of a deadly weapon (§ 12022, subd. (b)(1)) and the infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)), two counts of battery (§ 242), and one count of contempt of a protective order (§ 166, subd. (c)(1)). The third amended information further alleged defendant had two strike priors (§§ 667, subds. (a)(1), (d) & (e), 1170.12, subds. (b) & (c)) for assault with a deadly weapon (§ 245, subd. (a)) and for assault with force likely to cause great bodily injury (§ 245, subd. (a)(1)) with the infliction of great bodily injury (§ 12022.7).

## B.  *Prosecution Evidence*

Kimberly Celoni and defendant were married in February 1997. At the end of 2007, defendant told Celoni he wanted a divorce but she resisted. After defendant stalked her, accused her of infidelity, and made threats of violence against her and her children, Celoni agreed to a divorce in March 2008. After a further stalking incident on April 2, 2008, she filed a police report and obtained a protective order.

At this time, Celoni and defendant jointly owned a Mercedes SUV, which defendant referred to as his "truck." They both made payments on the vehicle. Celoni separately owned a convertible Mercedes 280 SLK. At an April 9, 2008 divorce hearing the judge ordered that both vehicles go into Celoni's custody. The judge instructed defendant to figure out how much the Mercedes SUV was worth and give Celoni half that amount. In response to the judge's instructions, defendant became furious and "started

2

ranting and raving in the courtroom and walked right out before it was finished." Before storming out, defendant told the court all he wanted was his truck.

At the same hearing, a five-year restraining order was issued against defendant. Among other constraints, it ordered defendant to stay at least 100 yards away from Celoni, her home, job, and car. Defendant refused to accept the order documents at the hearing.

Two days later, on April 11, Celoni drove past defendant in her Mercedes convertible on Mission Street in San Francisco. Spotting her, defendant said, "Hey, bitch. Come on over here." Celoni made a U-turn in the middle of the street to escape confrontation with defendant whereupon he immediately called her cell phone. Celoni drove directly to the police station where, together with Officer Campagnoli of the domestic violence unit, she listened to his voicemails. In the voicemail messages defendant told Celoni the "last motherfucker you'll see is me" at "four in the motherfucking morning" and he would go to "death row" for what he planned to do. Defendant repeatedly stated: "I'm taking everything from you that you took from me."

On the night of April 13, Celoni left her Mercedes convertible and the Mercedes SUV she shared with defendant parked in front of her house. Both vehicles were in good condition at this time. The next morning all four tires on both vehicles had been slashed.

On April 15, Celoni was at her office when defendant once again called. In his voice message he told Celoni: "Now you have everything. Just look out your window." Celoni spotted defendant from the window in the back of her office walking out of the office parking lot up Mission Street. In another message left the same day defendant stated: "[Y]ou ended up treating me like a gorilla pimp. Think about it. You said fuck it, I'm taking the truck . . . and I'm disrespecting you."

At the end of the workday, Celoni discovered photos of her daughter and granddaughter under the windshield wiper on her car. She recognized the photos as those belonging to defendant. Celoni's car was parked in the office parking lot where defendant had been seen earlier that day.

3

After weeks of intimidation, defendant turned threat to action when, at approximately 4:18 a.m. on April 16, he broke into Celoni's home through the garage door window. Defendant made verbal threats against Celoni's life and brandished a hammer as he attempted to enter through the window. Unable to safely escape defendant from the ground floor, Celoni jumped from the upstairs balcony. The fall broke her back and rendered her immobile. Finding her vulnerable, defendant began to strike Celoni repeatedly with the hammer. The majority of the blows landed on Celoni's head, although her left hand was also severely injured as she attempted to shield her face from the attack. As a result of the permanent injuries she sustained in the attack, Celoni is now on lifetime disability.

## C. *Defense Evidence*

The sole defense witness, defendant's brother, Ken Acosta, testified to defendant's tumultuous history of drug abuse. Acosta testified his brother sustained a long period of sobriety during his marriage to Celoni, but began using narcotic drugs again in the months prior to his attack on Celoni in April 2008. In summation, the defense admitted to defendant's threats and violence but argued defendant's intoxication at the time of the offenses prevented him from forming the specific intent necessary to sustain conviction on the associated charges. On the charge of vandalism, the defense argued the evidence did not support a finding of guilt beyond a reasonable doubt.

## D. *Verdict, Sentence, Appeal*

The jury acquitted defendant of two of the four criminal threat counts, and one of the two stalking counts was presented to the jury as a lesser included offense. Defendant was found guilty of all remaining counts and all of the special allegations associated with those counts were found to be true.

The trial court sentenced defendant to an aggregate term of 142 years to life in prison. This timely appeal followed.

4

## II. DISCUSSION

### A. Faretta *Motion*

Defendant first contends the trial court erred in denying his motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

#### 1. *Facts*

After a complaint was filed on April 18, 2008, charging defendant with 23 counts, defendant was arraigned on November 3, 2008. The case ultimately went to trial July 11, 2011. During the interim three years, 2008, 2009, and 2010, defendant made six separate requests to continue his trial. In addition to the requested continuances, defendant submitted multiple motions to substitute counsel during the three years preceding trial. Defendant submitted a *Marsden*[2] motion on October 9, 2008, against his first defense attorney, Kenneth Quigley. This motion was denied. However, Quigley was ultimately relieved for good cause on June 8, 2010, and replaced by Floyd Andrews. Defendant made two motions to discharge Andrews, on May 2 and 16, 2011.

Defendant's trial commenced on July 11, 2011. During a hearing on in limine motions on the second day of trial, defendant interjected as follows: "Can I address the Court real quick? I've been waiting since I got in this jail for a time that I ask to address the Court, patiently." After the court asked defendant to first take some time to consider what he planned to tell the court and to confer with defense counsel before doing so, defendant stated: "I'm almost willing to plead guilty so I don't have to listen to [the prosecutor's] squeaky voice another minute. I want to make a *Faretta* motion." The court informed defendant that it was "too late" to make a *Faretta* motion as the trial had already begun.

Defendant stated he had been waiting for a time to make the *Faretta* motion and he had not been aware he was in the process of trial until the day prior. He further submitted he had tried two *Marsden* motions, both of which had been denied. To this,

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) (holding a defendant has the right to discharge appointed counsel upon a showing of ineffective representation).

the court explained the *Faretta* motion is a motion for self-representation and defendant's attorney could no longer help him. The following colloquy ensued: "THE COURT: You won't be permitted to have [defense counsel] sitting there so that he could advise you as to what to do or you couldn't consult with him or anything. You are on your own. That's the motion that you are making right now? [¶] THE DEFENDANT: Under pro per, I can get some help to help me guide through the system. [¶] THE COURT: That type of help to guide you through the system is not available on a *Faretta* motion. [¶] THE DEFENDANT: Maybe I have it mixed up. Can you consider it? I would rather just defend myself. [¶] THE COURT: Based upon the record before me now and the timing of the motion and the reasons that you give, you are tired of listening to the prosecutor? [¶] THE DEFENDANT: I was being facetious. Really, she drives me crazy, but that's not my issue. I don't feel I'm getting representation here and I—no insult to the lawyer, he's great, but I don't think—this is not a good fit. It's not working. [¶] THE COURT: . . . [¶] The Court views your position as being you are seeking the Court to give you another attorney, which the Court is not going to do. It's untimely to do at this point. [¶] And it's also a motion to represent yourself in case I don't give you another attorney. [¶] On the surface of it, based upon what you've told me here, this is an apparent use—some might say manipulation of two rights—in the hope that some type of error might arise out of that."

The court subsequently held a hearing on the *Marsden* motion outside of the presence of the prosecutor. At this hearing, defendant expressed frustration with his attorney due to a lack of witnesses to testify on his behalf: "Nobody is being contacted. I'm not okay with the idea of going to jail for the rest of my life. I'm 60. And there's virtually no witnesses—character witnesses or legal witnesses." When questioned further as to who he believed should be called defendant stated: "I would have to get a phone book and address book of people I've known for the last 30 years." He continued, "I would need some help, and I would need a private investigator. That's why I think I could do it on my own." When the court requested he describe the witnesses if he could not name them, defendant offered: "My director at my job. There's some 40 or 50

6

clients who are their family members.  There's my family members.  There's 50 people in Narcotics Anonymous . . . ."

The court denied defendant's motions to discharge current counsel and to represent himself at trial.  As with defendant's prior *Marsden* motions regarding Andrews, the court determined defendant had not offered evidence showing defense counsel provided inadequate representation or the presence of irreconcilable conflict likely to result in ineffective representation.  Quite to the contrary, in the court's view " 'the quality of counsel's representation . . .' [¶] . . . has been excellent."  Quoting from and citing the reasoning in *People v. Marshall* (1996) 13 Cal.4th 799, 827, the court determined defendant's *Faretta* motion to be untimely and equivocal.  Specifically, the court underscored the "unreasonable" length of time between defendant's arraignment and the requested *Faretta* motion.  Also "clear from [the] record" was " 'defendant's prior proclivity to substitute counsel.' "  The court further observed the need to consider the potential for disruption and delay to proceedings.  To this end, the court stated: "[T]he defendant has presented nothing to this Court to indicate that he would be able to proceed expeditiously with the trial on his own."  To the contrary, the court noted defendant's ill-conceived belief that he would receive assistance "to guide him through the proceedings . . . shows that there would be a substantial disruption or delay."  The court determined the delay would be untenable given "the stage of the proceedings is at the trial stage right now . . . . this is the second day of trial."  Further, based on the timing, the "entire record before the Court and the defendant's reasoning," the court could not "make [the] finding" that defendant's motion was "clear and unequivocal" and "premised on a real desire to act as his own attorney."

**2. *Applicable Law***

Under the Sixth Amendment, a defendant has a federal constitutional right to represent himself if he knowingly and intelligently elects to do so.  (*Faretta, supra*, 422 U.S. 806.)  However, the right to self-representation is not absolute.  Motions for self-representation made within close range of or after commencement of a defendant's trial may be rejected subject to the trial court's discretion:  "In order to invoke an

7

unconditional right of self-representation, the defendant must assert the right 'within a reasonable time *prior* to the commencement of trial.' [Citations.] *A motion made after this period is addressed to the sound discretion of the trial court.*" (*People v. Burton* (1989) 48 Cal.3d 843, 852, italics added.)

As stated in *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*): "For example, a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court which should consider relevant factors . . . ." (*Id.* at p. 128, fn. 5.)

Furthermore, the timeliness determination is not based on an arbitrary sum of days, but rather, upon the trial court's consideration of the "totality of the circumstances" at the time the motion is made. (*People v. Lynch* (2010) 50 Cal.4th 693, 724, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.) Such circumstances include: the time between the motion and the scheduled trial date, "whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Id.* at p. 726.) In balance with the Sixth Amendment right to effective assistance of counsel, the court is required to "draw every inference against supposing that the defendant wishes to waive the right to counsel." (*People v. Marshall* (1997) 15 Cal.4th 1, 23 (*Marshall*).) To grant such a waiver, the trial court must find a defendant's motion for self-representation to be unequivocal. (*Windham, supra*, 19 Cal.3d at pp. 127–128.) As stated in *People v. Valdez* (2004) 32 Cal.4th 73, 98–99 (*Valdez*): " '[T]he court . . . should evaluate not only whether the defendant has stated the motion clearly, but also . . . . the defendant's conduct or words reflecting ambivalence about self-representation . . . . A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Marshall,*

*supra,* 15 Cal.4th at p. 23.)  However, if the request is both timely and unequivocal, the trial court must grant a defendant's motion for self-representation without concern for the wisdom of such a decision.  (*Windham,* at pp. 127–128.)

A reviewing court must give " ' "considerable weight" ' " to the trial court's exercise of discretion.  (*People v. Hall* (1978) 87 Cal.App.3d 125, 132.)  This discretion is extensive.  (*People v. Hardy* (1992) 2 Cal.4th 86, 196.)  We presume the court knows and correctly applies the law.  (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

### 3. *Analysis*

Defendant contends the trial court erroneously denied his *Faretta* motion in violation of his federal constitutional right to self-representation.

Defendant first argues his *Faretta* request was unequivocal.  His claim is straightforward: because he plainly stated the words, "I want to make a *Faretta* motion," defendant maintains his request was unequivocal.  We disagree.

Our Supreme Court in *Marshall* stated:  "It is not only the stability of judgments that is at stake . . . when we require a defendant to make an unequivocal request for self-representation.  The defendant's constitutional right to the effective assistance of counsel also is at stake."  (*Marshall, supra,* 15 Cal.4th at pp. 22–23.)  In order to protect this fundamental right, the United States Supreme Court specifically instructed the trial courts to ascertain "whether the defendant truly desires to represent himself or herself."  (*Id*. at p. 23.)  Apart from the defendant's clear statement of the *Faretta* motion, the court must consider the totality of his words and conduct reflecting ambivalence about self-representation.  (*Valdez, supra,* 32 Cal.4th at pp. 98–99.)

A motion for self-representation made "in passing anger or frustration" may be denied.  (*Marshall, supra,* 15 Cal.4th at p. 23.)  Defendant's original statement, "I want to make a *Faretta* motion," was made in close conjunction with his complaint regarding the prosecutor's "squeaky voice."  So ambiguous was his statement, the trial court was forced to clarify:  "THE COURT:  Based upon the record before me now and the timing

9

of the motion and the reasons that you give, you are tired of listening to the prosecutor?" While defendant then denied his annoyance factored into his request, his full statement reflects frustration rather than a fully considered desire for self-representation.

Defendant's comments to the court also suggest he lacked basic knowledge of what self-representation would entail. The trial court had to repeatedly explain to defendant the realities of his proposed motion. He admitted his own confusion, stating, "Maybe I have it mixed up," but nonetheless requested the court proceed to consider his *Faretta* motion. Defendant's queries about "get[ting] some help to help me guide through the system" combined with his complaints to the court regarding his trial counsel tend to support the trial court's intuition that defendant's interest in bringing the *Faretta* motion was to be rid of his attorney rather than a sincere and contemplated desire to represent himself. (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1205.) Defendant's confusion and his focus on dissatisfaction with Andrews are also sufficient grounds to find his *Faretta* motion equivocal. (*Scott,* at p. 1205.)

Defendant complains the trial court "precluded [him] from making his *Faretta* request more unequivocal." He argues the trial court's first response stating his *Faretta* request was "too late," " 'foreclosed any realistic possibility [he] would perceive self-representation as an available option,' " thereby preventing him from making an unequivocal invocation. (See *People v. Dent* (2003) 30 Cal.4th 213, 219.) This assertion ignores the entirety of the trial court's discussion of defendant's *Faretta* motion. Following the challenged comment, the trial court engaged defendant in lengthy conversation to make certain he understood what a *Faretta* request entailed. Reasonably deducing defendant might be dissatisfied with his representation, the trial court offered him an in camera *Marsden* hearing on the spot so defendant could freely voice his concerns regarding defense counsel. Upon its denial of the *Marsden* motion, the trial court informed defendant it would next turn to consideration of his *Faretta* motion. We find the trial court's management of defendant's *Faretta* motion provided abundant opportunity for defendant to unequivocally state his request for self-representation.

10

Defendant next contends his motion would have been considered timely under the interpretation of *Faretta* applied in certain federal appellate courts. In the event of any discrepancy in the application of the United States Supreme Court's precedents regarding self-representation, however, we are bound to follow our own high court's rulings. (*People v. Burton, supra,* 48 Cal.3d at p. 854.)

Defendant correctly points out that the California Supreme Court has not fixed any set time (*People v. Clark* (1992) 3 Cal.4th 41, 99–100; *Windham, supra*, 19 Cal.3d at p. 128), however as defendant concedes, California precedent firmly supports the trial court's finding that defendant's *Faretta* motion was untimely because it was submitted after trial had begun. (See *People v. Clark*, at pp. 99–100 [before jury selection, while pretrial motions were being heard]; *People v. Hamilton* (1985) 41 Cal.3d 408, 419–421 [motion made during pretrial proceedings on motion to suppress and again during jury selection]; *People v. Scott, supra,* 91 Cal.App.4th at pp. 1204–1205 [four days before trial]; *People v. Rudd* (1998) 63 Cal.App.4th 620, 624–626 [three calendar days before trial]; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 789 [six calendar days prior to trial]; *People v. Morgan* (1980) 101 Cal.App.3d 523, 531 [just before jury selection].)

Relying chiefly on a footnote in *Windham*, quoted above, defendant contends his *Faretta* motion was nevertheless timely because his "trial clearly had not begun in any practical sense" and there was no evidence he intended to request a continuance. But our Supreme Court in *Windham* made no such fine distinction about when a trial begins. It held that in order to invoke the constitutionally mandated unconditional right of self-representation, a defendant in a criminal trial must assert that right within a reasonable time *prior* to trial. (*Windham, supra*, 19 Cal.3d at pp. 127–128.) Defendant readily admits he made his request after his case had been called to trial.

We also question defendant's assertion there was no evidence in the record that he "was going to request a continuance." Defendant not only stated an intent to introduce testimony from 40 to 50 clients and 50 members of Narcotics Anonymous, but he also made it plain that he would require a private investigator to locate these individuals. That defendant did not expressly request a continuance does not mean a postponement of trial

11

would not be necessary.  We find defendant's *Faretta* motion was untimely and therefore falls into the realm of cases appropriately addressed "to the sound discretion of the trial court."

In exercising its discretion, the trial court should consider (1) the quality of counsel's representation, (2) the defendant's prior proclivity to substitute counsel, (3) the reasons for the request, (4) the length and stage of the proceedings, and (5) the disruption or delay which might reasonably be expected to follow the granting of such a motion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1104–1105; *People v. Nicholson* (1994) 24 Cal.App.4th 584, 591.)  A review of these factors in defendant's case convinces us that the trial court did not abuse its discretion in denying his belated *Faretta* request.

The trial court appropriately weighed the first three factors relating to defense counsel.  After entertaining three separate *Marsden* hearings at defendant's behest, the court determined the "quality of [defense counsel Andrews'] representation" to be "excellent."  Defendant himself referred to Andrews as a "great" attorney, but insisted their relationship was "not a good fit."  The second factor, defendant's proclivity to substitute counsel, is well supported by the record.  Prior to his *Faretta* motion, defendant sought to discharge both of his appointed defense attorneys, Attorney Andrews on two separate occasions.  Defendant stated no additional reason for his *Faretta* request beyond his frustration with Andrews.  The trial court explored these issues with defendant in some detail in the July 12, 2011 *Marsden* hearing, and correctly concluded that the premise for defendant's motion was groundless.

The length and the stage of the proceedings also militated against defendant's *Faretta* motion.  (*People v. Barnett, supra,* 17 Cal.4th at pp. 1104–1105.)  Pretrial proceedings took more than three years to complete.  During this time, defendant requested and was granted continuances on six separate occasions.  As defendant's trial at long last drew near, he twice attempted to discharge Andrews.  He offered no justification for his delay, failing to adequately explain why he waited until the second day of trial to bring his *Faretta* motion.  In conjunction with defendant's history of continuance

12

requests and motions to discharge counsel, the trial court could reasonably surmise the object of defendant's *Faretta* motion was delay.

As to the final *Windham* factor, the trial court correctly pointed out the likelihood that substantial disruption or delay would result from defendant's last minute self-representation. Defendant's desire to pursue many dozens of unnamed and effectively unknown witnesses presented a logistical nightmare that would surely occasion an undetermined amount of delay. The trial court noted defendant presented no evidence to indicate "he would be able to proceed expeditiously with the trial on his own."

In our view, the trial court did not abuse its discretion in denying defendant's *Faretta* motion.

## B. *Vandalism/Substantial Evidence*

In the alternative, defendant contends there is insufficient evidence to support his felony vandalism conviction.

In reviewing a criminal conviction challenged on the basis of insufficient evidence, we " ' "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) The court's role on appeal is limited. "[W]e are bound to give due deference to the trier of fact and not retry the case ourselves." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) The relevant inquiry before the court is whether there is substantial evidence to support the conclusion of the trier of fact, not whether guilt is established beyond a reasonable doubt. (*People v. Mosher* (1969) 1 Cal.3d 379, 395.)

To sustain a conviction for vandalism under section 594, it must be proven that a defendant (1) maliciously (2) damaged or destroyed (3) any real or personal property not his or her own. (§ 594, subd. (a).) If the resulting damage exceeds $400, the offense rises to the level of a felony. (§594, subd. (b)(1).)

Defendant argues there is insufficient evidence in the record to support the jury's implicit finding that he slashed the eight tires on the two vehicles belonging to Celoni. According to defendant, his conviction must be reversed because there "was no direct evidence it was he who vandalized the tires." He points to a lack of eyewitness testimony, fingerprint evidence, or physical evidence connecting him to the incident or to the scene. Defendant further contends the circumstantial evidence presented at trial "merely showed he was the 'most likely suspect.' " While we agree there is no *direct* evidence, " 'Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208, italics omitted.)

The relevant facts are undisputed. Uncontroverted evidence showed, at the time the vandalism occurred, defendant was engaged in a course of conduct intended to terrify and intimidate Celoni. Defendant exhibited a particular fixation with Celoni's vehicles, beginning with his statements and conduct at the divorce hearing on April 9, 2008. As testimony revealed, at this hearing, defendant became enraged when the Mercedes SUV he coowned with Celoni was placed in her exclusive custody. He told the court that all he wanted was his truck and then stormed out of the courtroom. Two days later he left Celoni a threatening voicemail which jurors might have reasonably viewed as a reference to the vehicles: "I'm taking everything from you that you took from me." On April 14, Celoni found all eight tires from the two vehicles had been slashed overnight in front of her home. In a voicemail left the following day, defendant told Celoni, "Now you have everything," and in an additional voicemail taunted her, again referring to the SUV: "You said fuck it, I'm taking the truck . . . and I'm disrespecting you." On the same day, defendant approached Celoni's car while she was at work, leaving photos of Celoni's daughter and grandchild on the car and calling her to let her know what he had done.

As the preceding facts make plain, over the course of this week, defendant's anger regarding Celoni and the Mercedes SUV did not abate. Instead, the jury could have reasonably perceived in defendant's conduct a pattern of escalating attempts to harm

14

Celoni by leaving frightening verbal messages, vandalizing her property, and menacing her at her workplace, all culminating in his attempted murder of Celoni at her home during the early morning hours of April 16, 2008.

We apply the substantial evidence test. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Staten* (2000) 24 Cal.4th 434, 460, italics omitted.) We must presume in support of those findings the existence of every fact that one could reasonably deduce from the evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

Even where the evidence is circumstantial, if there is substantial evidence to support conviction, " ' " 'the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Holt* (1997) 15 Cal.4th 619, 668.) We may not set aside a true finding for insufficiency of the evidence unless it appears that under no theory presented is there sufficient evidence to support it. (See *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

We believe this evidence does more than, as defendant contends, "form the basis for a strong suspicion of [defendant's] guilt." We may not be swayed by the absence of certain forms of evidence, such as eye witness testimony or fingerprints, but instead are compelled to review the evidence actually presented at trial. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [appellate court "failed to view that evidence in the light most favorable to the judgment" when it "focused on what it found *lacking* in the prosecution's case" rather than contrary inferences the jury may have drawn].) We find the testimony of Celoni and other evidence presented at trial to be of reasonable, credible, and solid value. In our view, the accumulated circumstances—including defendant's threatening behavior, his protracted anger regarding the Mercedes SUV, his violence toward Celoni, and his readiness to follow through with his threats—sustain a reasonable inference defendant slashed the tires on Celoni's vehicles. In finding the evidence sufficient to justify such an inference, " ' "it is the jury, not the appellate court[,] which must be convinced of the

15

defendant's guilt beyond a reasonable doubt." ' "  (*Id*. at p. 11.)  We affirm the jury's conviction on the charge of felony vandalism.

### III.  DISPOSITION

The judgment is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Banke, J.


_____
Sepulveda, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, First Appellate District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.