Filed 4/20/21  P. v. Turner CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C074524 |
| Plaintiff and Respondent, | (Super. Ct. No. SF123036A ) |
| v. | |
| THOMAS JAMES TURNER, | |
| Defendant and Appellant. | |

Defendant Thomas James Turner was charged with a series of domestic violence acts against the same victim.  A jury found him guilty of a single violation of Penal Code section 273.5, subdivision (a),[1] and further found that defendant caused great bodily injury under circumstances involving domestic violence (§ 12022,7, subd. (e)).  The trial

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

court found three prior strike convictions and section 667, subdivision (a) allegations true, and sentenced defendant to a term of 39 years to life.

In multiple briefs, defendant contends:  (1) the trial court erred in denying his *Faretta*[2] motion to represent himself; (2) the trial court prejudicially abused its discretion by stationing a sheriff's deputy behind him while he testified at trial; (3) the conviction offense did not qualify him for three strikes and section 667, subdivision (a), sentencing; (4) he should not have been sentenced to two section 667, subdivision (a), enhancements; (5) his prior conviction for a violation of section 417.8, exhibiting a deadly weapon with intent to resist arrest or detention, does not qualify as a serious felony offense and therefore should not factor into his three strikes sentencing or serve as a prior serious offense for section 667, subdivision (a) sentencing; and (6) in light of Senate Bill No. 1393 (S.B. 1393), the case must be remanded to permit the trial court to exercise its discretion to strike the section 667, subdivision (a), serious felony enhancements.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges and Enhancement Allegations

Defendant was charged with six counts of inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); counts 1, 2, 3, 4, 5, 9); criminal threat (§ 422; count 6); dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 7); and false imprisonment by violence (§ 236; count 8).  Count 1 is alleged to have occurred on February 7, 2013.  Counts 2 through 5 were all alleged to have occurred between February 8 and February 11, 2013.  Count 9 is alleged to have occurred in October 2012.  As to counts 1, 2, 3, 5, 6, and 9, defendant was alleged to have caused great bodily injury under circumstances involving domestic violence.  (§ 12022.7, subd. (e).)  As to counts 2,

---

[2]  *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta*).

3, 4, and 9, it was also alleged defendant personally used a weapon in the commission of the crime. (§ 12022, subd. (b)(1).) For count 2, the alleged weapon was a baseball bat; for count 3, a beer bottle; for count 4, a stick; and for count 9, a knife. And as to all counts, defendant was alleged to have three prior serious felony convictions (§§ 667, subd. (a) & 1170.12, subd. (b)) and a prior prison term (§ 667.5, subd. (b)).

### Prosecution Evidence

Defendant and the victim were involved in an off-and-on romantic relationship from July 2012 until February 11, 2013. During that time, they lived together some of the time and apart at other times; the last time they lived together began in January 2013 and ended on February 11, 2013, the date of the last domestic violence incident. Both were homeless and were living along Highway 99 in Stockton. They frequently drank alcohol, smoked marijuana, and used methamphetamine.

The victim testified that in October 2012, defendant came to the area where she was living, threatened to kill her, and stabbed her six times using two knives. The victim did not seek medical attention or report the attack to anyone. She testified that she used super glue to close the knife wounds.

In November 2012, defendant punched the victim multiple times. She sprayed him with pepper spray and fled. She sustained "a black eye and messed up lip." Again, she did not seek medical treatment or contact the police.

On February 7, 2013, defendant and the victim got into an argument because the victim did not want to get drugs for him. He beat her with his fists when she refused. The victim's eye was blackened and swollen shut. She did not go to the hospital or contact the police; instead, she ran to a friend's house at a neighboring trailer park.

On February 10, 2013, defendant and the victim "fought and argued all day." In the morning, they began arguing because defendant was using methamphetamine. Defendant dragged the victim down a hill; when the victim attempted to leave, defendant chased her, so she hid from him. She stayed at a friend's house overnight and returned to

3

their shared encampment the following morning. There, she found defendant using methamphetamine. When she tried to leave, defendant would not let her. She sat on the mattress, where they continued to argue about drugs and alcohol.

Later, in the afternoon, February 11, defendant began hitting the victim. He sat on top of her on the bed and repeatedly hit her in the face and on the top of her head with his fists. She testified that as he struck her, she could hear "stuff breaking." She felt her nose break, felt two of her teeth being knocked out, and felt punches on her face, forehead, and head. She repeatedly asked defendant to stop, which he finally did. He left to get more beer from his hiding place, and the victim remained on the mattress. He brought her a beer, apologized, helped her clean up some of the blood, and they drank together.

When the victim told defendant she needed to "go to the bathroom," he thought she was trying to leave. He grabbed her by the hair, ripping some of it from her head, threatened to kill her, and began to look for knives to stab her. When he could not find the knives, he threw other things at her and appeared to leave, but was actually on top of a nearby bridge. Thinking he was gone, the victim attempted to leave, but she ran into defendant. He dragged her back to the mattress, where she gave up and fell asleep.

The victim later awoke to defendant jumping and stomping on her legs. He again threatened to kill her. She screamed and he knelt on top of her and strangled her. She lost consciousness and later awoke to defendant beating her with a beer bottle. He also stabbed her under the arm with a pointed stick. She lost consciousness again and awoke at the bottom of the hill, where she had been dragged by defendant. Defendant was hitting her with his bicycle, and then with a modified baseball bat. He hit her in the forehead with the bat and she heard a "crack." He continued to break objects on the victim, including a radio and ice chest. The victim tried to crawl away but defendant kicked her in the face and ear.

4

Thereafter, defendant stopped; she could no longer see him, but she could hear him looking for her. She crawled in the dark to the nearby frontage road because she could not walk.

A good Samaritan who was driving by saw her in the middle of the road waving him down, and stopped to help her. He testified that she was bleeding and dragging one of her legs behind her. He called 911, and the sheriff's department and paramedics responded.

The responding deputy testified that she found the victim lying in a fetal position, "screaming, moaning, crying in pain" and repeatedly saying that defendant was trying to kill her. The deputy testified that the victim was "red from head to toe." From what the deputy could see in the dark with her flashlight, the victim's face was swollen and bloody and she had marks on her arms.

The victim was taken to a hospital by ambulance, where she presented with two spinal fractures and a fibular fracture to one of her legs. She also sustained significant trauma to the head area. She had numerous facial fractures, including a maxillary sinus fracture, two orbital fractures on the left side, and "severely comminuted nasal fractures" on both sides of the nose. Her eyelids were swollen shut, she could not open one of her eyes and there was soft tissue swelling along the left scalp. There were lines on her left cheekbone that could be consistent with a shoe mark. Additionally, she had several abrasions. The victim's treating physician testified that the nasal and orbital fractures could have been caused by a punch to the face, being stomped on with shoes, or hit with a baseball bat, and that it takes substantial force to break a bone.

The victim had a blood-alcohol level of 0.25 percent and tested positive for marijuana. She did not test positive for methamphetamine, however.

**Defense Evidence**

Defendant testified he met the victim when she was dating one of his friends. When that boyfriend was incarcerated for domestic violence, the victim asked defendant

5

to come to her camp and drink with her.  Defendant routinely checked on her, brought her food and beer, and generally helped her.  Eventually in July 2012, they began a sexual relationship.  In October, the victim was forced out of her campsite by Caltrans and went to stay with another ex-boyfriend.  Defendant denied that he and the victim lived together at all in 2012, and denied that he stabbed her in October 2012 or hit her in November 2012.  He testified he did not see her at all between Halloween and New Year's Day.

Defendant testified that someone appeared in the middle of the night on January 1, 2013, and hit him in the face while he slept.  He did not see anyone, but he heard someone and tried to find them.  As he followed the sound, he came across the victim, who was on a mattress, in shorts, a "slingshot," and no shoes.  She appeared disoriented.  She was breathing hard, and he thought she must have been the one who hit him.  He tried to report the attack to the police, but the police station was closed.  On cross-examination, defendant claimed he spoke with an officer but reported that "a Mexican guy" had hit him because he wanted to cover for the victim, and because he speculated the attack had been part of a gang initiation.  Later that afternoon, the victim tackled him and admitted she had hit him with a piece of rebar.  Nevertheless, defendant let her stay with him.

Defendant also denied hurting the victim on February 7, 2013.  He said they were drinking and she fell down the embankment, approximately 30 feet at a 30 degree pitch.  As a result, she had scratches on her arms and face.  And, on February 8, 2013, she cut herself.  Defendant also denied beating the victim on February 10, 2013, and denied using methamphetamine that day.

Defendant testified that on February 11, 2013, he and the victim were drinking together though he knew she could become violent when drunk.  At some point, she became so drunk that she fell down; she was running down the embankment and "slam[med] into the concrete."  She tried to brace her fall with her arm, but hit the right side of her face with enough impact that "it knocked her out."  He tried to revive her by

talking to her and shaking her, and she slowly "came out of it" but she was making "funny smiling faces." He sat her up, told her what happened, and they both began to climb back up the embankment. He reached the camp first and began reading a book.

When he looked up, the victim had a knife in her hand and was coming at him. She hit him with the butt of the knife on his spine and held the knifepoint to his temple. Defendant later testified the victim hit him with the blade but that he was not hurt because he was wearing several layers of clothing. Defendant testified he "snatched her up," and she "sw[u]ng [at him] with the knife." He testified, "I hit her once, bam," took the knife, and "chuck[ed]" it. She began clawing at his face, so he grabbed her and pushed her down. She grabbed his foot, and he kicked her once, hard in the cheek. She still did not let go, so he kicked her again in the thigh. He tried to get away and she threw bottles at him. He denied hitting her with a baseball bat or bike, poking her with a stick, or choking her. Defendant testified that he rode his bicycle to his son's house and tried to call 911 but could not reach the 911 operator. Thereafter, he rode his bicycle to buy beer and drank it. He returned to the encampment, but left when the victim began to throw bottles at him. After dark, he went back to the camp for a blanket, but he left again, even though the victim was no longer there.

## Verdicts and Sentencing

The jury acquitted defendant on all counts except a single count of inflicting corporal injury on a cohabitant (count 5). As to that count, the jury found defendant guilty and also found true the allegation that he had inflicted great bodily injury under circumstances involving domestic violence. The trial court found the prior strike, section 667, subdivision (a), serious felony conviction and section 667.5, subdivision (b) prior prison enhancement allegations to be true, and struck the prior prison term enhancement for sentencing purposes. The court sentenced defendant to an aggregate sentence of 39 years to life.

## DISCUSSION

## I. *Faretta* Motion

## A. Additional Background[3]

Defendant was arraigned on an information on March 22, 2013. Counsel who represented defendant at trial was appointed at that time. The case was set for a trial readiness conference on June 5 and jury trial on June 21, 2013. Two pretrial conferences were held before the readiness conference. On June 21, the case was assigned to a trial department. In limine motions were heard on that day and the court requested 90 prospective jurors to appear on June 25.[4]

On the morning of June 25, while the prospective jurors assigned to the trial were on their way to the courtroom, defendant requested a *Marsden* hearing. He asserted, "I'm not going to go to trial with this guy." Defendant handed the court papers. The trial court reviewed defendant's motion and conducted an in camera hearing.[5]

During the in camera hearing, defendant's complaints first focused on trial counsel not providing him a copy of the preliminary hearing transcript, the victim being "coerced" to come to court for the preliminary hearing in what defendant asserted was a

---

[3] Since defendant made his *Faretta* request during an in camera *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118) and the context is important, we set forth those proceedings in some detail. We order the proceedings unsealed only to the extent necessary to address defendant's *Faretta* claim and his contention about the positioning of the deputy during his testimony.

[4] We take judicial notice that June 21, 2013, was a Friday and June 25, 2013, was the following Tuesday. (Evid. Code, §§ 452, subd. (h), 459 subd. (a)(2); *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936.)

[5] Defendant's written *Marsden* motion is not in the record on appeal, but reading the reporter's transcript, the issues addressed by the court in the in camera hearing appear to be what was set out in the motion.

8

violation of Code of Civil Procedure section 1219 (section 1219)[6] and defendant's desire to have trial counsel file a motion to dismiss asserting prosecutorial misconduct based on the purported violation of section 1219.

Regarding the preliminary hearing transcript, defendant complained he repeatedly asked trial counsel for a copy, but was not given access to it until 90 days after the preliminary hearing. And when counsel brought the transcript to the jail, he took it back, telling defendant an extra copy for him would cost money.

Defendant complained that a bench warrant issued for the victim to compel her appearance at the preliminary hearing was "illegal" under "1219(b)." He complained the prosecutor did not follow the "format" in section 1219, so he thought there were grounds for a prosecutorial misconduct motion. He stated that the victim testified during the preliminary hearing, "I don't want to be here, I'm here because I fear being locked up. They never told me about my rights as a domestic violence victim as far as I don't have to testify, all they said was they can help me." Defendant added, "which means they can screw me around and enforce her to get a conviction, basically, what that amounts to, is how I took it."

Defendant went on to complain that the victim did not have to show up for the preliminary hearing as required by the subpoena because she is a domestic violence victim. He complained that the victim told the Sheriff's deputies she did not want to

---

[6] In pertinent part, section 1219, subdivision (b), in effect at the time, provided: "Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt when the contempt consists of *refusing to testify* concerning that sexual assault or domestic violence crime. Before finding a victim of a domestic violence crime in contempt as described in this section, the court may refer the victim for consultation with a domestic violence counselor. All communications between the victim and the domestic violence counselor that occur as a result of that referral shall remain confidential under Section 1037.2 of the Evidence Code." (Italics added.)

testify and did not want defendant to go to jail. He continued: "It's gotten too far out of hand. Somebody needs to step in that can step in and maintain the law and uphold procedures like they are supposed to be upheld and keep this from getting out of hand. This is getting way out of hand, is what it is." He complained about all the charges that had been alleged against him, but acknowledged "I can understand one domestic violence charge of 273.5(A) with GBI based on the pictures and the police report."[7] Defendant complained that trial counsel was not doing anything he asked and that he would not get a fair trial with trial counsel's representation. Defendant concluded: "I mean, I can go on and on and expound further and further, but why? It's cut and dried. It's like the 1219(B) in that motion, it's cut and dried."

Beginning with what appears to have been the first item on defendant's list, the court began to explain why a copy of the preliminary hearing transcript would not be provided. As the court did that, the following colloquy took place.

"THE COURT: [Y]ou want a copy of the prelim transcript. There is no rule that requires that your attorney give you a copy of the prelim transcript. He has to go over it with you so that he can understand your responses to some of [the] claims that are made.

"DEFENDANT: How about I go pro per?

"THE COURT: He does not have to give you a copy of the transcript.

"DEFENDANT: I'll go pro per, Your Honor.

"THE COURT: So that's – so it's not a basis for finding [defense counsel] ---

"DEFENDANT: I have a right to go pro per, too.

"THE COURT: No, you don't.

"DEFENDANT: Yes, I do. I do have that right.

---

[7] Presciently, this is exactly what the jury ultimately found him guilty of.

10

"THE COURT: You know, you and I might differ, and if I'm wrong, the appellate court will correct me, okay?

"DEFENDANT: We already know the appellate court is going to.

"THE COURT: I get to make *the decisions*, and *I'm finding* that you don't have a right to.

"DEFENDANT: 1219, the appellate court is going to reverse this." (Italics added.)

Referencing defendant's *Marsden* motion, the trial court then engaged in an explanation about the history of section 1219, and explained that it does not protect a domestic violence victim from having to honor a subpoena and appear in court or prohibit the prosecution from requesting a bench warrant to compel the victim's appearance. As the trial court explained, it only protects victims if, once in court, they say they do not want to testify. The court concluded trial counsel was not incompetent for not having filed the motion defendant wanted, noting the motion would have been frivolous and attorneys are not required to file frivolous motions.

The court started to take up the next item on defendant's written motion, which apparently related to a claim the case should have been filed as misdemeanors instead of felonies. Defendant interrupted, "how many felonies am I facing?" The court responded, "Mr. Turner I understand, you know, I know you're having a tough time. Unfortunately, *we could have had this conversation earlier, had you requested it, but it is really is quite late to be doing this*." (Italics added.)

The court found that trial counsel had not been incompetent and told defendant he was lucky to have him. The court explained that counsel had appeared before the court numerous times, "has a wealth of knowledge about the law, and he fights very hard for his clients, and he has gotten some good results" in all the courts in the county. The following colloquy then occurred:

11

"DEFENDANT: Your Honor, you can hold this -- proceeding in absentee because I'm not going to be with this man. I don't want this man representing me.

"THE COURT: [Trial counsel] is a fine lawyer.

"DEFENDANT: He is not representing me. *Get me out of here or I'm going to cause a scene, I'm warning you. I'm giving you fair warning.*

"THE COURT: I'm going to deny the Marsden hearing under these circumstances.

"DEFENDANT: *I'm not going to get up, but I'm just going to keep doing this and disrupting.*[8]

"THE COURT: Okay.

"DEFENDANT: Your Honor, I don't want this man representing me." (Italics added.)

The court asked trial counsel if he wanted to respond. Counsel explained what he told defendant about his prosecutorial misconduct motion, which coincided with what the trial court had just told defendant; section 1219 did not prohibit compelling a domestic violence victim's appearance pursuant to a subpoena.[9] He stated he had visited defendant "numerous times." He gave defendant the preliminary hearing transcript to review for two weeks.

Trial counsel noted defendant's problem was that this is a three strikes case and any felony with a great bodily injury enhancement would result in a term of 25 to life. Counsel then informed the court that defendant passed up an offer of ten years.

---

[8] Defendant's conduct is pertinent to his *Faretta* contention and the second issue we address on appeal, the positioning of the bailiff during his testimony.

[9] Counsel said according to his file, the victim did not originally appear at the preliminary hearing, a bench warrant was issued for her appearance, and the case was continued one day. She ultimately testified without asserting any privilege.

Defendant interrupted, complaining that he was being "railroaded" but added: "[I]f my lawyer can get this ten put back on, I'll take the ten and we can avoid all of this." Counsel stated that when talking to defendant, "as the court has experienced," defendant "will fire back at you, not let you get a word in." The trial court admonished defendant, "let him finish." Defendant continued: "I feel pushed into a situation like that. Put the ten back out, I'll take the God damn ten." The court admonished defendant again to let trial counsel finish what he had to say.

Trial counsel summarized his professional experience for the record, noting that he had been handling criminal matters over thirty years. He had handled "all kinds of cases, death penalty cases, murder cases, three strikes cases." He continued: "I have handled hundreds of cases in this county, probably thousands of cases in thirty years, not all serious, but many serious cases. I have had trials in San Francisco County, so that's just my credentials."

Defendant persisted in claiming section 1219 had been violated. He argued the prosecutor was supposed to get the victim a counsellor, drop the charges, and refile.

Defendant did not express a desire for self-representation other than mentioned *ante*. Ultimately, the trial court told defendant: "Your best chance to avoid a conviction is to stick with this guy right here and work with him. If you want to beat this whole thing, you do what he tells you to do. He is a good lawyer." To that, defendant stated: "I know he is." The court indicated its intent to proceed with defense counsel representing defendant, and told defendant if he is convicted he could raise all the complaints he made on appeal.[10] The court then asked that the jury panel be brought in.

---

[10] Defendant has not raised any issues related to section 1219 in this appeal.

### B. Defendant's Contentions

Defendant acknowledges that when an untimely *Faretta* motion is made, the trial court has discretion to deny or grant it. He asserts, however, that the trial court failed to exercise its discretion under the purported belief that defendant had *no right* to represent himself. He also complains that the trial court failed to consider the factors set forth in *People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*), to appropriately consider the timeliness of defendant's request. We reject defendant's *Faretta* claim.

### C. Analysis

#### 1. Timeliness

" '[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 425 (*Buenrostro*), quoting *Windham*, *supra*, 19 Cal.3d at p. 128.)

"A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right *within a reasonable time prior to the commencement of trial*." (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*), italics added.) But "the right of self-representation is not absolute." (*Ibid*.) A *Faretta* motion may be denied if untimely. (*Ibid*.) "[A] motion is timely if made 'a reasonable time prior to the commencement of trial.' " (*Id*. at p. 722.) The purpose of the timeliness requirement "is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' " (*Ibid*.) The timeliness requirement "reflects that 'the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' " (*Ibid*.)

We review a trial court's denial of a *Faretta* motion for abuse of discretion. (*Buenrostro*, *supra*, 6 Cal.5th at p. 426; *People v. Valdez* (2004) 32 Cal.4th 73, 103

(*Valdez*).) " 'A trial court abuses its discretion when its rulings "fall 'outside the bounds of reason.' " ' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1182 (*Smith*); *People v. Powell* (2011) 194 Cal.App.4th 1268, 1278 (*Powell*).)

As our high court noted in *Lynch*, it has "held on numerous occasions that *Faretta* motions made on the eve of trial are untimely." (*Lynch*, *supra*, 50 Cal.4th at p. 722.)[11] The *Lynch* court went on to explain that motions made "long before trial" have been considered timely, citing a case where the motion was made seven months before the penalty retrial and another made one year before the preliminary hearing. (*Id*. at p. 723.) Contrasting eve-of-trial motions and motions made long before trial as two opposite points in a continuum of time, the court in *Lynch* stated the following: "our refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates *that outside these two extreme time periods*, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*Ibid*., italics added.) Regarding the day-of-trial end of the continuum, the court in *Powell, supra*, 194 Cal.App.4th 1268, stated, based on *Lynch*: "a trial court rarely should grant such a motion on the day set for trial," and further observed, "[a]

---

[11] As examples, the *Lynch* court listed *People v. Horton* (1995) 11 Cal.4th 1068, 1110, (self-representation motion made on the date scheduled for trial untimely) and *People v. Clark* (1992) 3 Cal.4th 41, 99-100 (case had been continued day to day after day set for trial "in the expectation that the motions would be concluded and jury selection set to begin at any time," and hence the defendant's motion made three days after day set for trial was "in effect the eve of trial" and untimely). More recently, in *Buenrostro, supra*, 6 Cal.5th at page 427, our high court cited other examples, including *Valdez, supra*, 32 Cal.4th at page 102 (*Faretta* motion made "moments before jury selection was set to begin" was untimely), *People v. Frierson* (1991) 53 Cal.3d 730, 742 (defendant's request for self-representation was untimely when made on the eve of trial, over 10 months after appointment of trial counsel), and *People v. Burton* (1989) 48 Cal.3d 843, 853 (defendant's *Faretta* request was untimely when made "after the case had been called for trial, both counsel had answered ready, and the case had been transferred to a trial department for pretrial motions and jury trial" and jury selection was to commence the next day).

15

motion made that close to the day set for trial is 'extreme' [citation] and now is disfavored." (*Id*. at p. 1277.)  Here, defendant's motion was made on the extreme end of the continuum.  Indeed, defendant mentioned self-representation for the first time not close to trial or even on the eve of trial, but at the beginning of trial, after in limine motions and while the prospective jurors were making their way to the courtroom for jury selection.

Defendant makes much of the trial court's statement that defendant did not have a *right* to self-representation, asserting that the court's statement was legally wrong.  It was not.  Our high court has made clear, " ' "[w]hen a motion for self-representation is not made in a timely fashion prior to trial, self-representation *no longer is a matter of right* but is subject to the trial court's discretion." ' "  (*Valdez*, *supra*, 32 Cal.4th at p. 103, italics added.)  In our view, the trial court's reference to its authority *to make the decisions* is a reference to the court's authority to exercise its discretion, and the court stating it was "*finding*" defendant did not have a right of self-representation was an exercise of that discretion.  (Italics added.)  And, although the court did not mention timeliness at that junction in the proceedings, it did later.  As noted, in connection with defendant's *Marsden* claims, the court told defendant:  "Mr. Turner I understand, you know, I know you're having a tough time.  Unfortunately, *we could have had this conversation earlier, had you requested it, but it is really is quite late to be doing this*." (Italics added.)

### 2.  *Windham / Lynch* **Factors**

Defendant also asserts that, because the trial court did not expressly address timeliness using the factors outlined by our high court, it was an abuse of discretion to deny his *Faretta* request.  In this regard, defendant points to the factors set forth in *Windham*, *supra*, 19 Cal.3d at page 128.  The *Windham* court held that when a defendant makes an unequivocal but untimely request, "the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the

event that appellate review is later required. Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Id*. at pp. 128-129, italics added.) More recently, our high court held in *Lynch* that timeliness is based on the totality of the circumstances that exist in the case at the time the self-representation motion is made. (*Lynch*, *supra*, 50 Cal.4th at p. 724.) The *Lynch* court went on to state: "a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Id*. at p. 726.)

The trial court here undoubtedly could have made a better record. However, it need not have expressly cited the *Windham* factors or any factors that motivated its decision. It is sufficient if there is substantial evidence in the record to support the court's exercise of discretion to deny the request. (*People v. Perez* (1992) 4 Cal.App.4th 893, 904 (*Perez*) ["While the court did not specifically make [a *Windham* ] inquiry, we conclude there were sufficient reasons on the record for the court to exercise its discretion to deny the request"]; see also *Powell*, *supra*, 194 Cal.App.4th at p. 1278 [defendant made *Faretta* motion on the date set for trial; the appellate court stated: "[t]he trial court need not have elaborated on its ruling that defendant's motion could not be granted under such inopportune circumstances"]; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206 ["while the trial court may not have explicitly considered each of the *Windham* factors, there were sufficient reasons on the record to constitute an implicit consideration of these

17

factors"].) *Windham* "specifically contemplated that even without a recitation of reasons for denying an untimely *Faretta* motion, 'there should be a sufficient record on appeal in such cases in order to sufficiently evaluate alleged abuses of discretion when motions for self-representation are denied.' " (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1355, quoting *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6.)  Our review of the totality of the circumstances supporting the trial court's decision here follows.

### a. The Stage of the Proceedings, Ongoing Pre-trial Proceedings, and Defendant's Prior Opportunities to Seek Self-representation

In *Windham*, the court cited the stage of the proceedings as a relevant factor (*Windham*, *supra*, 19 Cal.3d at p. 128), and in *Lynch*, the court cited whether there were "ongoing pretrial proceedings," the "time between the motion and the scheduled trial date," and added as a consideration whether the defendant had prior opportunities to assert his right of self-representation (*Lynch*, *supra*, 50 Cal.4th at p. 726).

Here, four months lapsed between the arraignment on the information when trial counsel was appointed and the first time defendant mentioned self-representation. During that time period there were numerous court settings when defendant had earlier opportunities to assert his right of self-representation.  After the case was assigned to the trial department, motions in limine were heard on June 21, 2013, and still defendant did not mention self-representation, but he undoubtedly heard the trial court announce on the record it was requesting a jury panel of 90 people for June 25, 2013.  It was not until the morning of June 25 when, for the first time, defendant mentioned self-representation, during the *Marsden* hearing held just as the court was about to bring the panel of prospective jurors into the courtroom.

### b. The Reasons for Self-Representation

In *Windham*, the court cited the reason for the request for self-representation as a relevant consideration.  (*Windham*, *supra*, 19 Cal.3d at p. 128; see also *Buenrostro*, *supra*, 6 Cal.5th at 427.)  The immediate reasons for mentioning self-representation

18

appear to be defendant's desire to have a copy of the preliminary hearing transcript and a disagreement with counsel about a motion related to section 1219. As to the latter, trial counsel had previously, correctly, explained the motion had no validity. Then, at the *Marsden* hearing, the trial court also correctly informed defendant the motion was not viable, and further informed him that trial counsel was not incompetent for refusing to make what would have been a frivolous motion. The court's explanation came after the colloquy where defendant mentioned self-representation. (See *Windham*, at p. 129 ["We find no abuse of discretion in the trial court's denial of the motion. The sole reason put forth by defendant to support his request was the claim that his admittedly competent counsel had been unable to present a stronger case on the theory of self-defense"]; *Scott, supra,* 91 Cal.App.4th at p. 1206 [defendant's "main problem with counsel was a disagreement over trial tactics, which is 'an insufficient reason to grant an untimely *Faretta* request' "].) Instead of persisting in a genuine claim for self-representation, defendant's last statement was that his case would be reversed because of his section 1219 argument: "1219, the appellate court is going to reverse this."

The record is clear that the first time defendant mentioned self-representation was when the trial court was explaining why he was not entitled to his own copy of the preliminary hearing transcript. In context, his question, "How about I go pro per?" followed by "I'll go pro per, Your Honor" appears to have been an effort to get the transcript by "go[ing] pro per" since he did not otherwise have a right to it.

### c. Reluctance of a Critical Trial Witness

Importantly, the court in *Lynch* cited the reluctance of crucial trial witnesses as a relevant consideration. (*Lynch*, *supra*, 50 Cal.4th at p. 724.) Here, a bench warrant was required to secure the victim's appearance for the preliminary hearing. The record clearly demonstrates defendant knew long before trial was to begin that the victim was reluctant and otherwise problematic. His comment about things "getting out of hand"

suggests at that point he realized he could not count on her failing to appear to testify as a witness at trial.

### d. Potential for Disruption or Delay

*Windham* identifies, as a relevant factor, the delay or disruption that might be expected if a defendant is allowed to represent himself. (*Windham*, *supra*, 19 Cal.3d at p. 128.) Our high court has since characterized this factor as the "*potential* for delay or other disruption," and at the same time noted that although it is an important factor, it is not the only factor to be considered. (*Buenrostro*, *supra*, 6 Cal.5th at p. 426.) Given the timing here, it is fair to infer the proceedings would be disrupted by defendant's belated self-representation. Although the trial court did not expressly ask defendant whether he was requesting a continuance, defendant did not affirmatively state he was prepared to proceed with the trial as scheduled, including jury selection at that very moment. Moreover, we may fairly infer defendant needed time to prepare because his question, "how many felonies am I facing?" suggests he did not even fully comprehend something as rudimentary as the charges he was facing.

Regarding the potential for disruption, defendant interrupted the trial court and defense counsel multiple times during the *Marsden* proceedings, and the trial court had to remind defendant no fewer than five times not to interrupt when the court was speaking. Indeed, as the transcript reflects, defendant interrupted the court's explanation about the preliminary hearing transcript when he first mentioned self-representation. Furthermore, when it became clear the court was not going to replace trial counsel, defendant, who the trial court had already recognized was "having a tough time," threatened to become disruptive. As our high court observed in *Smith*, *supra*, 4 Cal.5th at page 1182, "[t]he trial court could reasonably believe that granting the motion would be disruptive because defendant would have difficulty controlling his temper."

20

### e. The Complexity of the Case

The record reflects the victim presented some unique challenges. Her potential testimony required a person with cross-examination skills that would be effective without seeming unduly aggressive to a jury. Her testimony called for someone skilled at establishing prior inconsistent statements. Also, in addition to the victim, the prosecution had listed 14 other witnesses, five of whom were medical-related witnesses.

### f. The Quality of Trial Counsel's Representation and Readiness to Proceed

In *Windham*, the court cited the quality of counsel's representation as a relevant circumstance (*Windham*, *supra*, 19 Cal.3d at p. 128), and in *Lynch*, the court also noted whether trial counsel was ready to proceed to trial was another relevant consideration (*Lynch*, *supra*, 50 Cal.4th at p. 724). At the trial readiness conference on June 5, 2013, speedy trial time remained waived but the case remained set for trial on June 21, which indicates trial counsel was prepared to proceed. As far as trial counsel's background and experience, he outlined his credentials on the record during the *Marsden* hearing, and the court was aware of the quality of trial counsel's representation in other cases. In the end, defendant even acknowledged that trial counsel was a good attorney.

### g. *Windham / Lynch* Conclusion

Throughout the proceedings, defendant only mentioned "go[ing] pro per" once. The record establishes substantial evidence supporting sufficient reason for the trial court to exercise its discretion to deny defendant self-representation (*Perez*, *supra*, 4 Cal.App.4th at p. 904) that existed prior to defendant's reference to self-representation and that developed thereafter. Because all of the aforementioned factors weigh against allowing self-representation, the trial court's refusal to allow defendant to represent himself was not an abuse of discretion. Moreover, as we next discuss, the record is not as clear as defendant suggests as to whether he even made an unequivocal request to represent himself.

### 3. Unequivocal Request for Self-Representations

"Even [if] a trial court denied the [*Faretta*] request for an improper reason, if the record as a whole establishes defendant's request was nonetheless properly denied on other grounds, we uphold the trial court's ruling." (*People v. Dent* (2003) 30 Cal.4th 213, 218.) Aside from the timeliness issue, the record is not clear defendant's request to represent himself was unequivocal. Courts "should draw every reasonable inference against waiver of the right to counsel," and consequently, "[a] motion for self-representation made in passing anger or frustration . . . or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Valdez*, *supra*, 32 Cal.4th at pp. 98-99.) Thus, "[a] court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words." (*Id*. at p. 98.) And a defendant's "single reference" to proceeding in pro per may be viewed "as an 'impulsive response' " to a denial of a *Marsden* request. (*Id*. at p. 99; see also *People v. Marshall* (1997) 15 Cal.4th 1, 21, citing *People v. Hacker* (1990) 563 N.Y.S.2d 300, 301 [recognizing a New York case where the appellate court held the record as a whole did not reflect an unequivocal request for self-representation, but rather a spur of the moment decision prompted by the denial of defendant's motion for substitute counsel]; *Scott*, *supra*, 91 Cal.App.4th at p. 1205 ["the motion was not unequivocal. [Defendant] made his *Faretta* motion *immediately after* the trial court denied his *Marsden* motion, and [defendant's] subsequent comments suggest he made the *Faretta* motion only because he wanted to rid himself of appointed counsel"].)

Our review of the entire record – not just the isolated part of the record cited in defendant's briefing – reveals defendant's request was an impulsive reaction to the court explaining why he could not get a copy of the preliminary hearing transcript. Defendant's frustration was apparent. The trial court recognized defendant was having "a tough time." And regarding representation, the transcript reveals that defendant's

focus was firing trial counsel. But, despite his desire for substitute counsel, later in the proceedings, defendant expressed a desire to rely on trial counsel to reopen the plea negotiations in an effort to get the prosecutor to reoffer a ten-year deal. Under the circumstances, defendant's request for self-representation was not unequivocal and for this separate reason, we conclude the trial court did not abuse its discretion in its decision concerning self-representation.

## II. Positioning of the Bailiff During Defendant's Testimony
## A. Additional Background and Defendant's Contentions

At sentencing, defense counsel, at defendant's prompting, informed the court defendant objected to the sheriff's deputy sitting behind him while he testified at trial. Defendant felt the presence of the sheriff's deputy made him appear violent. Counsel stated, "I didn't object. This is done routinely with somebody in custody." The trial court stated, "It is true, especially in this courthouse, because we had the judge stabbed, we are probably overly cautious about things like that." The court went on to say that, though there had been a couple of deputies in the courtroom while defendant testified and one was "seated at the top of the courtroom," defendant was not subjected to any other restriction. The court did not say anything about the threat defendant made during the in camera *Marsden* hearing to be disruptive; the in camera proceedings had been sealed.

Defendant contends in his original brief that the trial court abused its discretion by stationing a sheriff's deputy behind him while he testified, and that the error was prejudicial. Alternately, he contends that trial counsel rendered ineffective assistance by failing to object to the presence of the deputy during his testimony.

Because of defendant's threat to become disruptive during the in camera *Marsden* hearing, we conclude the trial court did not abuse its discretion in allowing a deputy to be stationed behind defendant when he testified, even though the court did not expressly make a case-specific determination that the security measure was needed and place the reasons for that determination on the record. Moreover, even if the bailiff's positioning

23

was error, defendant was not prejudiced because it is not reasonably probable he would have achieved a better result if the deputy had not been seated behind him while he testified. Finding no error or prejudice, we also reject defendant's contention that he received ineffective assistance of counsel.

## B. Analysis

### 1. Abuse of Discretion

"A 'trial court has broad power to maintain courtroom security and orderly proceedings. [Citations.]' [Citation.] For this reason, decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion." (*People v. Stevens* (2009) 47 Cal.4th 625, 632 (*Stevens*).) However, some "extraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial" and "must be justified by a particularized showing of manifest need sufficient to overcome the substantial risk of prejudice they pose." (*Ibid.*) But "the stationing of a courtroom deputy next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need." (*Id.* at pp. 629, 635-636.) Thus, we review the trial court's decision here to station a deputy behind defendant for abuse of discretion.

While a showing of manifest need is not required, our high court has said the trial court must nonetheless exercise its discretion on a case-by-case basis and cannot simply follow a generic policy in deciding whether to station a deputy near a testifying defendant. (*Stevens, supra*, 47 Cal.4th at pp. 642, 644; see also *People v. Hernandez* (2011) 51 Cal.4th 733, 742 (*Hernandez*).) And "[t]he trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant." (*Stevens*, at p. 642.) Trial judges have a duty to state the reasons for such a decision on the record. (*Hernandez*, at p. 744.)

Analogizing this duty to sentencing decisions, our high court stated, " 'a requirement of articulated reasons to support a given decision serves a number of interests: it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring that the judge himself analyzes the problem and recognizes the grounds for his decision; and it aids in preserving public confidence in the decision-making process by helping to persuade the parties and the public that the decision-making is careful, reasoned and equitable.' " (*Hernandez*, *supra*, 51 Cal.4th at p. 744.) Where the record does not reveal this level of "thoughtful consideration" but instead indicates the court has relied on a generic policy, "the order constitutes an abuse of discretion, and *an appellate court will not examine the record in search of valid, case-specific reasons to support the order*." (*Id.* at p. 744, italics added.)

However, while we need not search the record, we cannot ignore it either. As noted, during the *Marsden* hearing, defendant declared, "Get me out of here or I'm going to cause a scene, I'm warning you. I'm giving you fair warning," and "I'm not going to get up, but I'm just going to keep doing this and disrupting." This was reason enough to allow the deputy's positioning during defendant's cross-examination. The trial court simply may have felt compelled not to state for the record what happened during the sealed proceedings. In any event, under these circumstances, we cannot say the court abused its discretion.

## C. Harmless Error

Even if the trial court had a duty to state specific reasons under circumstances where a defendant had been openly disruptive on the record during in camera proceedings, defendant's claim here still fails in the absence of prejudice.

Because the proximal presence of a security officer while a defendant testifies is not an "inherently prejudicial practice," a court's failure to "exercise discretion and make a record of case-specific reasons for ordering this procedure" does not amount to a constitutional violation. (*Hernandez*, *supra*, 51 Cal.4th at p. 746.) Thus, a defendant

25

cannot demonstrate he was actually prejudiced unless he can establish it is reasonably probable he would have obtained a more favorable result absent the error under *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*). (*Hernandez*, at pp. 745, 746.) Our high court has noted that "the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Here, there is ample evidence from the victim, corroborated by the good Samaritan, the responding Sheriff's deputy, the victim's treating physician, and the photographs that defendant severely injured the victim, his current or former cohabitant, as charged in Count 5, which apparently pertained to the events of February 11, 2013.[12] Though the jury acquitted defendant of hitting the victim with a baseball bat or beer bottle, or stabbing her with a stick, the apparent shoeprint on the her face and defendant's own admission that he kicked her in the face was compelling evidence that defendant was guilty of inflicting corporal injury on a cohabitant.

Additionally, defendant's acquittal as to all other counts belies his contention that the jury assumed he was violent merely as a result of the deputy's position behind him during his testimony. Instead, defendant's own testimony demonstrated his violence. He testified that, after the intoxicated victim had purportedly knocked herself unconscious by "slam[ming] into the concrete" and then climbed an embankment and attacked him with a knife, he disarmed her and punched her in the face, "bam." He said he hit her "hard," but

---

[12] Count 5 was the last of the section 273.5, subdivision (a), counts that was alleged to have taken place between February 8 and February 11, 2013.

26

"not too hard." When she then purportedly began clawing at his face with her bare hands, defendant pushed her down to below his knee level. The victim then grabbed his foot, so he kicked her once in the face "hard." And, when she did not let go of his leg, he kicked her again in the thigh. He said, "the second kick I decided -- I kicked her a little too hard. She's a little thing." He said he outweighed the victim by 50 pounds. A photograph of the victim's face while she was at the hospital showed shoe tread marks on her cheek. Based on this evidence, it is not reasonably probable that defendant would have obtained a more favorable result on Count 5 absent the error. (*Hernandez*, *supra*, 51 Cal.4th at p. 746.) Thus, defendant was not prejudiced by the presence of a sheriff's deputy behind him while he testified.

### D. Ineffective Assistance of Counsel Claim

Defendant also contends his trial counsel's failure to object to the bailiff's position amounted to constitutional ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) Because we find there was sufficient reason for the positioning of the deputy based on defendant's own courtroom behavior during the in camera *Marsden* hearing – behavior trial counsel observed – and since defendant suffered no prejudice, we reject defendant's claim of ineffective assistance of counsel. We also note that counsel had good reason to believe a complaint about the positioning of the deputy would be futile, given defendant's behavior during the in camera Marsden hearing.

### III. Qualification of the Conviction Offense for
### Third Strike and Section 667, Subdivision (a) Sentences
### A. Additional Background and Defendant's Contention

As noted, defendant was convicted of infliction of corporal injury on a cohabitant (§ 273.5, subd. (a)) and causing great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)), and sentenced to a term of 25-years-to life as third strike offender in addition to two five-year terms under section 667, subdivision (a).[13] The information alleged that defendant violated section 273.5 in that he "inflict[ed] a corporal injury resulting in a traumatic condition upon Jane Doe who was then and there a . . . cohabitant. . ." It further alleged that, "in the commission of the above offense," defendant "personally inflicted great bodily injury under circumstances involving domestic violence upon Jane Doe, within the meaning of Penal Code section 12022.7(e) *and also causing the above offense to be a serious felony within the meaning of Penal Code section 1192.7(c)(8)*." (Italics added.) (Capitalization omitted.)

Defendant contends in his third supplemental brief that the conviction offense and enhancement did not constitute a serious felony offense because the prosecution did not *plead and prove* the great bodily injury victim was not an accomplice as required by section 1192.7(c)(8). Based on this, defendant asserts his conviction offense did not qualify him for a third strike sentence. He also asserts the conviction did not qualify him for the section 667, subdivision (a) serious felony enhancement sentence. Both contentions are meritless.

### B. Analysis

Under the current version of the Three Strikes law, the current conviction offense must be a serious or violent felony offense to qualify a defendant for third strike

---

[13] He was also sentenced to a consecutive term of four years for the section 12022.7, subdivision (e) great bodily injury enhancement.

sentencing. (§ 667, subd. (e)(2)(C); *People v. Johnson* (2015) 61 Cal.4th 674, 681.) Section 1192.7, subdivision (c)(8), provides that any "felony in which the defendant personally inflicts great bodily injury on any person, *other than an accomplice*" is a serious felony offense. (Italics added.) According to defendant, because section 12022.7, subdivision (e), pertaining to the personal infliction of great bodily injury involving domestic violence, does not include the words "other than an accomplice," it does not make an offense where such injury is inflicted a serious felony offense.

As noted, the information alleged the same person who was the victim of the charged crime, corporal injury on a cohabitant, was the same person who was the victim of the great bodily injury enhancement. An accomplice is a person who is liable to prosecution for the identical offense charged against the defendant. (§ 1111.) An accomplice is a principal in the crime and can be liable by directly perpetrating the act constituting the crime, aiding and abetting the act, or by being a coconspirator. (§ 31; *People v. Houston* (2012) 54 Cal.4th 1186, 1224.) An aider and abettor is a person who "aids, promotes, encourages, or instigates the perpetrator with the intent of encouraging or facilitating the commission of the crime." (*Ibid*.)

Defendant has not presented any authority establishing that it is even a legal possibility that a domestic violence victim who sustained great bodily injury could be an accomplice to her own victimization, and we are aware of none. Indeed, as far as we know, no crime prohibits a person from inflicting traumatic injury on themselves. Consequently, we conclude this scenario falls within the meaning of section 1192.7, subdivision (c)(8), because, as a matter of law, the great bodily injury victim cannot be an accomplice.[14]

---

[14] Defendant relies on *People v. Henley* (1999) 72 Cal.App.4th 555. *Henley* involved the question of whether a prior conviction constituted a serious felony offense because of the infliction of great bodily injury. In that case, defendant was charged with inflicting

Assuming the Legislature and the electorate intended the absurd consequence of requiring a showing that a domestic violence victim was not an accomplice to her own victimization, any error here had nothing to do with the pleading – the prosecution pled the great bodily injury made the offense a serious felony offense within the meaning of section 1192.7, subdivision (c)(8). Defendant simply ignores this fact when he asserts the prosecution did not plead the conviction offense is a serious felony offense. We agree with the People that if there was error, it related not to the pleading requirement, but rather to the proof requirement inasmuch as the jury was not instructed it had to find that the victim here was not an accomplice to her own victimization. We conclude any such error is harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] [the error is harmless beyond a reasonable doubt]; *Watson, supra*, 46 Cal.2d at p. 836 [it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the error].) Had the jury been instructed it had to find that the victim was not an accomplice, it would have done so.

The victim sustained two spinal fractures and a fibular fracture to one of her legs, significant trauma to the head area, numerous facial fractures, including a maxillary sinus fracture, two orbital fractures on the left side, and "severely comminuted nasal fractures" on both sides of the nose. Her eyelids were swollen shut and there was soft tissue swelling along the left scalp. Lines on her left cheekbone were consistent with a shoe mark. She had several abrasions. The treating physician testified that the nasal and orbital fractures could have been caused by blunt force trauma such as a punch to the face or being stomped on with shoes. Substantial force was required to cause those injuries according to the physician.

---

great bodily injury in the commission of evading a peace officer in violation of Vehicle Code section 2800.3. (*Henley*, at p. 559.) *Henley* did not involve the scenario we have here where the great bodily injury was inflicted against a victim of the charged crime who could not be an accomplice.

Based on the evidence the jury heard, it would not have found that the victim intentionally aided defendant when these injuries were inflicted; for example, it would not have found the victim aided defendant when he stomped or kicked her head, leaving footprint impressions on her face and causing the blunt force trauma previously described and that she did so sharing defendant's intent.

We conclude the current conviction offense, plus the great bodily injury enhancement, which was both pled and proven, made the conviction offense a serious felony offense within the meaning of section 1192.7, subdivision (c)(8). Additionally, the serious felony offense allegation was properly pled. The conviction offense and great bodily injury enhancement here qualified defendant for both three strikes sentencing and sentencing under section 667, subdivision (a).

### IV. Imposition of Two Section 667, Subdivision (a) Sentences

### A. Additional Background and Defendant's Contention

The court imposed two separate five-year terms under section 667, subdivision (a), one for the 2009 conviction for exhibiting a deadly weapon with intent to resist arrest or detention and the other for one of the 1984 first degree burglary convictions, noting that the two first degree burglary convictions were imposed at the same time.[15]

In his second supplemental brief, defendant contends one of the section 667, subdivision (a), prior serious felony enhancements must be stricken. This contention is completely meritless.

---

[15] The trial court stayed the section 667, subdivision (a), prior serious felony enhancement related to the other first degree burglary conviction. It also stayed imposition of the sentence on the single section 667.5, subdivision (b), prior prison term enhancement; it was for the sentence related to the exhibiting conviction.

31

## B. Analysis

Defendant relies on *People v. Sasser* (2015) 61 Cal.4th 1 (*Sasser*). In *Sasser*, a five-year sentence was added to each of several determinate term sentences for a single section 667, subdivision (a), prior. The *Sasser* court held that the single prior could only be applied once. (*Sasser*, at pp. 6-7.) Here, defendant had two section 667, subdivision (a), priors brought and tried separately. A separate five-year sentence may be imposed for each prior serious felony conviction " 'separately brought and tried.' " (*People v. Jones* (2015) 236 Cal.App.4th 1411, 1415.)

## V. Three Strikes and Section 667, Subdivision (a)

## Allegation Based on Prior Section 417.8 Conviction

## A. Additional Background and Defendant's Contention

In a bifurcated proceeding, the trial court found defendant had prior strikes for two first degree burglary convictions (§ 459) and one exhibiting a deadly weapon with intent to resist arrest or detention conviction (§ 417.8). The trial court rejected defendant's contention that the section 417.8 conviction was not a strike, ruling that "it clearly is covered by Penal Code section 1192.7 in that it is a felony in which a person personally used a deadly weapon. And so that's one of the serious felonies listed in that section." The court continued, "it was the use of a deadly weapon in connection with any type of felony" and further noted, "it was used in the sense that it was an implement designed to facilitate the use of the person getting away." As noted, defendant was sentenced as a third-strike offender and given an additional five-year sentence for the section 667, subdivision (a), enhancement based on the prior section 417.8 conviction.

In his second supplemental brief, defendant argues section 417.8 is not a serious felony offense under section 667, subdivision (a), because section 417.8 is not listed in section 1192.7, subdivision (c). We disagree.

## B.  Analysis

We first note that regardless of our holding as to the section 417.8 prior, defendant would still qualify for a life sentence based on the two prior first degree burglary convictions.  The import of our analysis here relates to the five-year section 667, subdivision (a) enhancement.

As for the section 417.8 conviction, as the trial court observed, it is a serious felony within the meaning of section 1192.7, subdivision (c)(23), because it qualifies as "any felony in which the defendant personally used a dangerous or deadly weapon."  The definition of "use" in this context includes displaying the weapon " 'in an *intentionally menacing manner*' . . . ."  (*People v. Winslow* (1995) 40 Cal.App.4th 680, 686, italics added; see also CALCRIM No. 3145.)  Section 417.8 provides: "Every person who *draws or exhibits* any . . . deadly weapon, *with the intent to resist or prevent the arrest or detention* of himself or another by a peace officer shall be imprisoned in the state prison for two, three, or four years."  (Italics added.)  As the trial court's ruling implies, drawing or exhibiting a deadly weapon in the context of intending to resist or prevent arrest or detention is the equivalent of displaying a weapon in an intentionally menacing manner.  Thus, the trial court's finding comports with our high court's pronouncement in *People v. Gallardo* (2017) 4 Cal.5th 120, that the trial court's role is "limited to identifying those facts that were established by virtue of the conviction itself."  (*Id*. at p. 136.)  Accordingly, we reject defendant's contention.

## VI.  Senate Bill No. 1393

## A.  Defendant's Contention

Defendant contends in his third supplemental brief that he is entitled to remand for the trial court to determine whether to exercise its discretion to strike or dismiss the section 667, subdivision (a), enhancement sentences under the authority granted in S.B. 1393. We disagree.  Statements the trial court made at sentencing make clear that it

33

would not have stricken or dismissed the section 667, subdivision (a), enhancements in the interest of justice under section 1385 if it had previously had the authority to do so.

## B. Additional Background

In considering whether to strike defendant's strike allegations under *People v. Romero* (1996) 13 Cal.4th 497 (*Romero*), and *People v. Williams* (1998) 17 Cal.4th 148, the trial court noted that defendant's two first degree burglary convictions were from 1984 when defendant was 18. The court stated: "[Y]ou just continued throughout your life to just keep yourself constantly in trouble with the police . . . and you are constantly in and out of jail. If it weren't for that I really would consider eliminating your strikes because they are so old. . . . [¶] Two of them anyway. The two most important ones. But you have just a consistent history, ever since then of constantly getting into one kind of trouble or another. And looking at the probation report, and they set forth your record on that . . . I don't see a lot of things like robberies or rapes or anything like that. But *you do hurt people*, sadly enough. *A lot of your convictions are types of convictions that relate to hurting people*. [¶] It's just you constantly are . . . getting into trouble one way or another. And you keep getting sent back on parole violations. So the result of that all is that I don't feel that I would be upheld if I were to strike any of your old strikes. I don't think that you come within the purview of the *Williams* case or the *Romero* case. I cannot find that legally permissible to strike any of your strikes." (Italics added.) The court concluded, "the sentence the law calls for . . . is perfectly justified in your case."

## C. Analysis

S.B. 1393 (2017-2018 Reg. Sess.) went into effect on January 1, 2019, and amended sections 667, subdivision (a), and 1385, subdivision (b) to give a trial court the authority to strike or dismiss a prior serious felony allegation in the furtherance of justice under section 1385. Because defendant's appeal was pending when S.B. 1393 went into effect, it applies to defendant retroactively. (*People v. Franks* (2019) 35 Cal.App.5th 883, 892 (*Franks*); *People v. Jones* (2019) 32 Cal.App.5th 267, 272-273 (*Jones*).)

34

Defendant asks us to remand this matter to allow the trial court to exercise its discretion as to whether to strike or dismiss the section 667, subdivision (a), enhancements under section 1385. The People argue that, given the various factors the court considered in ruling on the *Romero* issue and its reasons for its denial, remand would be futile. We agree with the People.

"We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*Jones*, *supra*, 32 Cal.App.5th at p. 273, quoting *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; accord, *Franks*, *supra*, 35 Cal.App.5th 883, 892.) "The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Jones*, at p. 273, citing *People v. McVey* (2018) 24 Cal.App.5th 405, 419.)

Here, the record clearly indicates the trial court would not strike or dismiss the section 667, subdivision (a), five-year enhancements. Indeed, in denying the *Romero* motion, the trial court considered the same section 1385 furtherance of justice factors it would be required to consider on remand to consider whether to strike or dismiss the section 667, subdivision (a) enhancements in the furtherance of justice under section 1385. (See *People v. Shaw* (2020) 56 Cal.App.5th 582, 586.) There are no other factors for the court to consider.

The court primarily focused on the probation report's recitation of defendant's criminal history. According to the probation report, defendant's criminal history spanned 29 years. The report reflects five felony convictions, 12 misdemeanor convictions, and 11 probation/parole violations. Of particular concern for the court was that "a lot of"

defendant's convictions "relate[d] to hurting people."[16]  And the court noted the sentence it imposed was "perfectly justified in [defendant's] case."  Given those statements, it is clear the trial court would not have found it in the interests of justice to strike or dismiss the two section 667, subdivision (a), enhancements for which it imposed five-year sentences.  Remand would be futile.

## DISPOSITION

The judgment is affirmed.

/s/
MURRAY, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
HOCH, J.

---

[16]  In addition to the current offense, the probation report reflects a 1992 conviction for section 273.5; a 1994 conviction for former 12021, subdivision (a), felon in possession of a firearm; a 2003 conviction for section 422, criminal threats; and the 2009 conviction for section 417.8, exhibiting a deadly weapon with intent to resist arrest or detention.